**RAILWAY LABOR EXECUTIVES' ASSOCIATION, et al., Appellants,**

v.

**CSX TRANSPORTATION, INC.**

No. 90–7079.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 5, 1991.

Decided July 5, 1991.

Rehearing and Rehearing En Banc Denied Sept. 19, 1991.

John O'B. Clarke, Jr., with whom L. Pat Wynns was on the brief, Washington, D.C., for appellants.

Ronald M. Johnson, with whom T. Jay Thompson was on the brief, Washington, D.C., for appellee.

Before WALD, BUCKLEY, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The Railway Labor Executives' Association and thirteen unions representing employees of CSX Transportation, Inc. ("CSXT"), one of the nation's largest railroads, brought an action claiming that the railroad's sale of rail lines prior to the completion of collective bargaining violated the Railway Labor Act, 45 U.S.C. §§ 151–163 (1988) ("RLA"). The district court (Lamberth, J.) dismissed the unions' complaint. On the authority of *Pittsburgh & Lake Erie Railroad v. RLEA*, 491 U.S. 490, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989) (*"P & LE"*), the court ruled that "the mere ownership and operation of rail lines is not a working condition preserved by the Railway Labor Act status quo" obligation. Transcript of Hearing, May 9, 1990, at 2, *reprinted at* Joint Appendix ("J.A.") 861. We affirm.

## I. BACKGROUND

In 1988, the major rail unions served bargaining notices on most Class I carriers, including CSXT, pursuant to section 6 of the RLA, 45 U.S.C. § 156. The notices called for negotiations over changes that the unions proposed to make to existing collective bargaining agreements. The proposals included successorship clauses—clauses providing that if the carrier sells or otherwise transfers any rail lines, it must require the purchaser or transferee to hire the affected employees and assume their collective bargaining contracts. The notices also sought labor protections and compensation, including penalty pay, for workers adversely affected by the sale, transfer, or abandonment of a line. CSXT's existing contracts did not contain any such provisions.

Along with other Class I carriers, CSXT entered into national bargaining over the section 6 notices. The railroads and unions invoked the services of the National Mediation Board, as provided in section 5 First of the RLA, 45 U.S.C. § 155 First, but to no avail. In April 1990, the parties declined the Mediation Board's offer of arbitration, and on May 3, 1990, the President created an emergency board pursuant to section 10 of the RLA, 45 U.S.C. § 160, to recommend a resolution of the dispute. That was the bargaining posture at the time of the district court's May 9, 1990, ruling. The presidential emergency board issued its report on January 15, 1991. The emergency board's recommendations did not produce a settlement of all issues, and Congress ultimately intervened to avoid a national rail strike. *See* Pub.L. No. 102–29, 105 Stat. 169 (1991). The results of this lengthy bargaining process are not at issue in the present case.

Our focus is on line sales that CSXT entered into after the unions served their bargaining notices but before the mediation process required by the RLA had been exhausted. In that period, CSXT agreed to sell six marginal lines, amounting to approximately two percent of its rail system, to small, short-line carriers. At least two of the relevant sales agreements required the purchasing carriers to accord hiring rights to certain affected workers, but none obligated the purchaser to assume CSXT's collective bargaining contracts.

Because these transactions involved the purchase of railroad property by other carriers, they could only be consummated with the approval and authorization of the Interstate Commerce Commission ("ICC") pursuant to sections 11343 and 11344 of the Interstate Commerce Act ("ICA"). *See* 49 U.S.C. §§ 11343, 11344 (1988). As a condition of such approval, the ICC must ensure that the railroads "provide a fair arrangement ... protective of the interests of employees who are affected by the transaction." *Id.* § 11347. To satisfy section 11347, the ICC imposes a set of labor protections commonly known as the *New York Dock* conditions, after *New York Dock Railway—Control—Brooklyn Eastern District Terminal,* 360 I.C.C. 60, *aff'd sub nom. New York Dock Railway v. United States,* 609 F.2d 83 (2d Cir.1979). *See RLEA v. ICC,* 930 F.2d 511, 512 (6th Cir. 1991).

The ICC eventually approved each of the sales transactions involved here, subject to the *New York Dock* conditions. *See, e.g., Wilmington Terminal R.R.—Purchase & Lease—CSXT,* 6 I.C.C.2d 799 (1990), *aff'd sub nom. RLEA v. ICC,* 930 F.2d 511 (6th Cir.1991); *Brandywine Valley R.R.—Purchase—CSXT,* 5 I.C.C.2d 765 (1989), *pet. for review dismissed,* No. 89–1503 (D.C. Cir. Mar. 27, 1991). To implement the labor protections imposed by the ICC, CSXT and the purchasing carriers were required to negotiate agreements with their respective employees that would supplement the seniority rights provided under existing collective bargaining contracts. In line with *New York Dock,* the implementing agreements had to guarantee, among other things, that any employee displaced or dismissed as a result of the transaction would continue to receive full pay and benefits for up to six years. *See, e.g., RLEA v. ICC,* 930 F.2d at 513.

The ICC, however, rejected the unions' construction of section 11347 and refused to require the purchasing carriers to hire

CSXT's employees or, as to any employees they did hire, to recognize the employees' unions or their collective bargaining agreements with CSXT. *See, e.g., Wilmington Terminal,* 6 I.C.C.2d at 819–26. The Sixth Circuit has affirmed the ICC's interpretation of section 11347. *RLEA v. ICC,* 930 F.2d at 514–20.

Appellants (collectively, "RLEA") filed the present action for declaratory and injunctive relief on September 22, 1989, before CSXT had consummated the sales. RLEA claimed that if CSXT sold its rail lines before exhausting the mediation process, it would violate sections 2 First, 5 First, and 6 of the RLA, which impose twin obligations on the railroad: an obligation to bargain over section 6 proposals, and an obligation to maintain existing working conditions while bargaining proceeds. *See* 45 U.S.C. §§ 152 First, 155 First, 156.

In dismissing RLEA's status quo claim, District Judge Lamberth applied the Supreme Court's opinion in *P & LE,* which held that the status quo obligation cannot be used to prevent a railroad from implementing an agreement to sell all of its assets. *See* 491 U.S. at 504–11, 109 S.Ct. at 2593–97. He ruled that the rationale of *P & LE* "does not make a distinction between partial and total sales." J.A. 861–62 (relying on *RLEA v. Chicago & N.W. Transp. Co.,* 890 F.2d 1024 (8th Cir.1989) ("*RLEA v. C & NW*"), *cert. denied,* —— U.S. ——, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990)). The transactions could go forward, in his opinion, because nothing in CSXT's existing collective bargaining agreements prevented such line sales or the resulting force reductions and furloughs.

Judge Lamberth also concluded that there was no present case or controversy concerning CSXT's bargaining obligation, as RLEA had conceded that CSXT was in fact participating in the ongoing mediation. RLEA does not challenge this aspect of the ruling on appeal. We therefore have no occasion to address whether and, if so, to what extent CSXT had a duty to bargain, even after ICC approval, over the effects of the line sales on its employees. *See P & LE,* 491 U.S. at 512 & n. 19, 109 S.Ct. at 2597 & n. 19; *RLEA v. C & NW,* 890 F.2d at 1025–26.

Following the judge's ruling, *New York Dock* implementing agreements were put in place for all six transactions. As of oral argument before this court, five of the six sales had been consummated.

## II. DISCUSSION

The RLA mandates multistaged procedures for resolving disputes over proposed changes in labor agreements. *See Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969). The procedures "are purposely long and drawn out," *P & LE,* 491 U.S. at 504, 109 S.Ct. at 2593 (quoting *Brotherhood of Ry. & Steamship Clerks v. Florida E.C. Ry.,* 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966)), and until the waltz is over, "neither party may unilaterally alter the *status quo.*" *Jacksonville Terminal,* 394 U.S. at 378, 89 S.Ct. at 1115.

Section 2 Seventh forbids the carrier from making any change in "the rates of pay, rules, or working conditions of its employees," as embodied in collective bargaining agreements, except by way of section 6. 45 U.S.C. § 152 Seventh. Section 6 provides in relevant part that both the railroad and the union must give at least thirty days' written notice of any proposed change in an agreement, and once notice is given, "rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon ... by the Mediation Board." *Id.* § 156.

Where an offer of arbitration from the Mediation Board has been refused, section 5 First provides that for thirty days after the Board notifies both parties that its efforts have failed, "no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose." *Id.* § 155 First. And if, as here, a presidential emergency board is created during this cooling-off period, under section 10 "no change, except by agreement, shall be made by the parties to the controversy in the conditions

out of which the dispute arose" until thirty days after the emergency board has reported to the President. *Id.* § 160.

In *P & LE*, the Supreme Court ruled that where, as in the present case, existing labor agreements do not prevent a railroad from selling its assets and do not shield employees from the adverse consequences of a sale, the railroad need not give notice under section 6 before selling all its assets and is not obligated to bargain over the sale or delay its implementation. *See* 491 U.S. at 504, 109 S.Ct. at 2593. The Court further held that the railroad could proceed with the sale, once approved by the ICC, even though the unions had given notice proposing a successorship clause and other labor protections essentially identical to those proposed by CSXT's unions. *See id.* at 509, 109 S.Ct. at 2596; *see also id.* at 497 n. 5, 109 S.Ct. at 2590 n. 5 (quoting unions' proposals).

The Court concluded:

> [T]he decision to close down a business entirely is so much a management prerogative that only an unmistakable expression of congressional intent will suffice to require the employer to postpone a sale of its assets pending the fulfillment of any duty it may have to bargain over the subject matter of union notices such as were served in this case. Absent statutory direction to the contrary, the decision of a railroad employer to go out of business and consequently to reduce to zero the number of available jobs is not a change in the conditions of employment forbidden by the status quo provision of § 156.... The RLEA concedes that had the collective-bargaining agreements expressly waived bargaining concerning sale of P & LE's assets, the unions' § 156 notices to change the agreements could not trump the terms of the agreements and could not delay the sale.... We think the same result follows where the agreement is silent on the matter and the railroad employer has proceeded in accordance with the ICA. In these circumstances, there is little or no basis for the unions to expect that a § 156 notice would be effective to delay the company's departure from the rail-road business. Congress clearly requires that sales transactions like P & LE's proposal must satisfy the requirements of the ICA, but we find nothing in the RLA to prevent the immediate consummation of P & LE's contract to sell.

*Id.* at 509, 109 S.Ct. at 2596.

RLEA's only argument to us is that the district court misread the reach of *P & LE*. According to RLEA, "the rationale in *P & LE* rests entirely on a distinction between partial and total line sales." Brief for Appellants 10. RLEA claims that CSXT's status quo obligation is governed instead by two earlier Supreme Court decisions, *Order of Railroad Telegraphers v. Chicago & North Western Railway*, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960) ("*Telegraphers*"), and *Detroit & Toledo Shore Line Railroad v. United Transportation Union*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969) ("*Shore Line*").

*Telegraphers* involved a railroad's decision to abandon a large number of its local stations and thus remove several hundred station attendants from the payroll. The Court held that the union had a right to strike to prevent the railroad from implementing the partial abandonment without first bargaining over its effects. *See* 362 U.S. at 339, 80 S.Ct. at 766.

In *Shore Line*, a railroad proposed to institute new work assignments, a change neither authorized nor prohibited by its collective bargaining agreement. The Court held that once the union had served notice of its intent to bargain over the new assignment scheme, the railroad was obligated to maintain the status quo. *See* 396 U.S. at 153–55, 90 S.Ct. at 301–02. The Court rejected the railroad's argument that the status quo encompassed only working conditions expressed in the parties' collective bargaining agreement. Rather, the Court concluded, status quo refers to "those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Id.* at 153, 90 S.Ct. at 301.

The Court in *P & LE* dealt extensively with *Shore Line* and distinguished it on three grounds. First, *Shore Line* "extended the relevant language of § 156 to its outer limits, and we should proceed with care before applying that decision to the facts of this case." 491 U.S. at 506, 109 S.Ct. at 2594. The Court expressed doubts about the conclusion in *Shore Line* that the status quo obligation extends to working conditions that objectively exist in practice even though not embodied in a collective bargaining agreement; but, without disturbing that holding, the Court stated that it was "not inclined to apply *Shore Line* to the decision of P & LE to go out of business." *Id.* at 506 n. 15, 109 S.Ct. at 2594 n. 15.

Second, the working condition at issue in *Shore Line*—the location of work assignments—"had been the unquestioned practice for many years." Thus, it was "reasonable for employees to deem it sufficiently established that it would not be changed without bargaining and compliance with the status quo provisions." *Id.* at 506, 109 S.Ct. at 2594.

Third, *Shore Line* "did not involve a proposal by the railroad to terminate its business." *Id.* at 507, 109 S.Ct. at 2594–95. "Whatever else *Shore Line* might reach, it did not involve the decision of a carrier to quit the railroad business, sell its assets, and cease to be a railroad employer at all...." *Id.* The Court relied on *Textile Workers Union v. Darlington Manufacturing Co.*, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), in concluding that such a decision has "legal significance." 491 U.S. at 507, 109 S.Ct. at 2594–95. *Darlington*, a case decided under the National Labor Relations Act ("NLRA"), held that an employer "has an absolute right to terminate his entire business for any reason he pleases." 380 U.S. at 268, 85 S.Ct. at 998, *quoted in* 491 U.S. at 507, 109 S.Ct. at 2594–95.

The Court dismissed *Telegraphers* in a footnote discussing *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981). *See P & LE*, 491 U.S. at 508 n. 17, 109 S.Ct. at 2595 n. 17. *First National* held that an employer's decision to close down a segment of its business is not among the "terms and conditions" for mandatory bargaining under the NLRA because "an employer's need to operate freely in deciding whether to shut down part of its business purely for economic reasons outweighs the incremental benefit that might be gained through the union's participation in making the decision." 452 U.S. at 686, 101 S.Ct. at 2584. *First National* distinguished *Telegraphers* on the ground that its "expansive" reading of the RLA did not govern a decision under the NLRA. *See id.* at 686–87 n. 23, 101 S.Ct. at 2584–85 n. 23.

Although *P & LE*, unlike *First National*, was governed by the RLA, the Court in *P & LE* distinguished *Telegraphers* on the facts: In *Telegraphers*, "a railroad was seeking simply to eliminate or consolidate some of its little-used local stations," whereas P & LE was seeking "to sell all its lines and go out of business." 491 U.S. at 508 n. 17, 109 S.Ct. at 2595 n. 17. The Court observed, "There is nothing in *Telegraphers* that forces us to reach the result, in this extreme case, that P & LE was prohibited from terminating its operations without first bargaining with the unions." *Id.*

In sum, the critical issue in *P & LE* was "a railroad's freedom to leave the market." *Id.* That was precisely the issue, in the Court's view, that *Shore Line* and *Telegraphers* did not involve. *Id.*

■ RLEA argues that but for the distinction between the sale of an entire railroad and the sale of a portion of its lines, the Court could not have decided *P & LE* without first overruling *Telegraphers*. RLEA concedes that in the absence of the section 6 notices, CSXT's ability to sell its lines is a managerial prerogative that is not limited by any existing agreement, either express or implied. But once the notices were served, RLEA contends, CSXT violated the status quo obligation, as broadly construed in *Shore Line*, "by exercising its ... managerial right in selling its rail lines under terms that change the employees'

working conditions—*i.e.*, their active employment." Reply Brief for Appellants 8.

RLEA argues further that because "the Act's purposes require that a carrier not alter the working conditions out of which the dispute arose ..., it logically follows that the status quo obligation should prevent the carrier from doing what the Section 6 notice seeks to limit." *Id.* at 8 n. 7. In effect, RLEA's concept of "status quo" is not tied to existing agreements or practices; it is defined by the wishes of the unions as expressed in their bargaining proposals. We disagree.

Although the treatment of *Telegraphers* and *Shore Line* in *P & LE* did turn in part on the partial/total distinction, we cannot accept RLEA's attempt to limit the Supreme Court's reasoning to cases in which a railroad decides to "sell all its lines and go out of business." *P & LE*, 491 U.S. at 508 n. 17, 109 S.Ct. at 2595 n. 17. Like our sister circuits, we can find no sensible basis for distinguishing between a sale of all assets and a sale of individual lines. *See Chicago & N.W. Transp. Co. v. RLEA*, 908 F.2d 144, 152, 155 (7th Cir.1990) ("*C & NW v. RLEA*"), *cert. denied*, — U.S. —, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991); *RLEA v. C & NW*, 890 F.2d at 1025. *See also RLEA v. Chesapeake W. Ry.*, 738 F.Supp. 1544, 1555 (E.D.Va.), *aff'd on other grounds*, 915 F.2d 116 (4th Cir.1990). The fundamental rule of *P & LE*, in our view, is that the railroad's "freedom to leave the market," 491 U.S. at 508 n. 17, 109 S.Ct. at 2595 n. 17, by terminating an operation or selling assets, is a matter of managerial prerogative. Nothing in the RLA indicates that a union can usurp that prerogative by filing a section 6 notice proposing to add a successorship clause to the collective bargaining agreement and then claiming that the railroad would violate the status quo by selling its assets before the termination of bargaining over the proposal. *See id.* at 509, 109 S.Ct. at 2596.

The freedom to leave the market includes the sale of individual rail lines. As the Seventh Circuit reasoned,

> [t]he decision to sell a line is not a decision about the utilization of labor or about wages, work rules, working conditions, job rights, etc. It is a decision to reduce the extent of the railroad's business, ... not a decision about labor inputs. It has of course consequences for the workers—any major business decision does. But if this were enough to make it a change in pay, work rules, or working conditions, then ... there would be no management prerogatives; and [*P & LE*] ... would be incoherent.

*C & NW v. RLEA*, 908 F.2d at 152. *See also First National Maintenance*, 452 U.S. at 677–79, 101 S.Ct. at 2580–81.

*P & LE* did not overrule *Telegraphers* and *Shore Line*, but it plainly limited their application. We think it now apparent that in the absence of an existing obligation in a labor agreement (or perhaps some past practice that has "ripened into a commitment," *C & NW v. RLEA*, 908 F.2d at 154), the railroad's capacity—the number of lines it operates—is not part of the status quo. Both *Telegraphers* and *Shore Line* involved the "utilization of labor," *id.* at 152: in *Telegraphers*, the concentration of work stations along a line, and in *Shore Line*, the location of work assignments. These are areas in which employees might reasonably expect that a long-established practice "would not be changed without bargaining." 491 U.S. at 506, 109 S.Ct. at 2594. But the unions could not reasonably expect CSXT to continue to own and operate unprofitable lines, or management to consult with the unions before selling such lines. *See id.* at 507, 109 S.Ct. at 2594–95.

■ Contrary to RLEA's premise, continued employment is not necessarily a working condition. *P & LE* establishes that at least in the context of management's freedom to withdraw from the market, "the relationship of employer-employee and the state of being employed" are not frozen by the status quo provisions of the RLA. *See* 491 U.S. at 505, 109 S.Ct. at 2593. The unions do have the right to bargain over the effects of line sales on employees. *See id.* at 512, 109 S.Ct. at 2597. But the transactions themselves may not be stalled by the railroad's bargaining obligations. *See C & NW v.*

*RLEA*, 908 F.2d at 153. Thus, even assuming CSXT had to bargain over RLEA's section 6 notices, we hold that CSXT did not violate the status quo provisions by consummating its partial line sales.

This conclusion follows even though in the present case, unlike *P & LE*, RLEA served its notices before CSXT had set the terms of its sales agreements. Nothing in the Supreme Court's status quo analysis depended on the timing of the section 6 notices. The Court's conclusion that in the absence of an existing obligation in a labor contract, a union cannot invoke the RLA status quo provisions to prevent the railroad from withdrawing from the market is equally applicable whether the section 6 notice is served before the railroad has agreed to the terms of the transaction or after the terms are set. In either case, we believe, section 6 does not give the union the right to "dictate the terms of the sale, and in effect challenge[ ] the decision to sell itself." 491 U.S. at 512, 109 S.Ct. at 2597.

Our application of *P & LE* also comports with our duty to interpret the RLA to complement the ICA. *See id.* at 510, 109 S.Ct. at 2596. The ICC has plenary authority to approve these sales, and it plays an important role under the ICA in effectuating economically efficient transactions. *See id.* at 510–11, 109 S.Ct. at 2596–97. Use of the RLA's status quo obligation to halt a sale approved by the ICC under section 11343 would short-circuit the functioning of the ICC and would bring the two statutes into conflict. *See C & NW v. RLEA*, 908 F.2d at 153. Like the Court in *P & LE*, we decline to create such a conflict. *See* 491 U.S. at 510–11, 109 S.Ct. at 2596–97.

Section 11341(a) of the ICA provides that a carrier in an approved transaction "is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let [it] carry out the transaction." 49 U.S.C. § 11341(a). The Supreme Court has recently held that section 11341(a) abrogates collective bargaining obligations and supersedes the RLA as necessary to carry out an ICC-approved transaction. *Norfolk & W. Ry. v. American Train Dispatchers Ass'n*, — U.S. —, 111 S.Ct. 1156, 1164–65, 113 L.Ed.2d 95 (1991). CSXT argues that we may affirm the district court on the alternative ground that under the immunity clause in section 11341(a), the ICC's approval of the sales preempts any bargaining and status quo obligations imposed by the RLA. Given our conclusion that the status quo obligation does not stand in the way of the ICC-approved sales, and given that CSXT's bargaining obligations are not before us, we have no need to explore the preemption question.

### III. Conclusion

The status quo obligation of the RLA does not apply to a railroad's sale of some of its lines. The scope of CSXT's duty to bargain over the effects of the sales is not before us. Accordingly, the district court's order dismissing RLEA's action is

*Affirmed.*