CSX TRANSPORTATION, INC., Appellant,

v.

UNITED TRANSPORTATION UNION, et al., Appellees.

No. 488, Docket 91–7675.

United States Court of Appeals, Second Circuit.

Argued Nov. 7, 1991.

Decided Dec. 16, 1991.

Ronald M. Johnson, Washington, D.C. (Charles L. Warren, Akin, Gump, Hauer & Feld, of counsel), Nicholas S. Yovanovic, Jacksonville, Fla., (CSX Transp., Inc., of counsel), for appellant.

L. Pat Wynns, Washington, D.C. (John O'B. Clarke, Jr., Highsaw, Mahoney & Clarke, P.C., of counsel), for appellees.

Before KAUFMAN, CARDAMONE, MINER, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Congress enacted the Railway Labor Act (the "RLA") in 1926 to bring stability to the fractious world of labor-management relations in the railroad industry. That stability has largely been achieved because of procedures that replace unilateral ac-tions by management and crippling strikes by labor with mandatory bargaining in cases where relations between the parties change. It is not always clear, however, what sorts of changes in carrier-union rela-tions require appropriate bargaining. To-day, we are asked to decide whether a sale by a railroad of some of its tracks to anoth-er carrier is a change in the "rates of pay, rules, or working conditions" of union workers employed on those tracks accord-ing to Section 6 of the RLA, 45 U.S.C. § 156 (1982) ("§ 6"). If it is, then a rail-road like appellant CSX Transportation ("CSX") cannot sell its track until it has agreed with unions like appellee United Transportation Union ("UTU") on new ar-rangements for employees affected by the sale. If it is not, then the railroad may sell without bargaining beforehand. We join all other circuits to have considered the question in holding that such sales are not changes in salaries, rules or job conditions, but rather are matters of management pre-rogative that may proceed without previous § 6 bargaining.

## BACKGROUND

We are no strangers to the dispute be-tween CSX and UTU, having decided an earlier question between the parties in *CSX Transportation, Inc. v. United Transportation Union,* 879 F.2d 990 (2d Cir.1989), *cert. denied,* 493 U.S. 1020, 110 S.Ct. 720, 107 L.Ed.2d 740 (1990) ("*CSX I*"). As that decision so thoroughly expli-cated the factual background underlying this on-going controversy, a brief review will suffice here.

Appellant CSX owns and operates over 21,000 miles of railroad tracks in the U.S. and Canada. As such, it is subject to the RLA. Likewise, appellees are labor orga-nizations and their officers who are "repre-sentatives" under that statute. *See* 45 U.S.C. § 151 First, Sixth (1982). During the late summer of 1987, CSX sought to sell 369 miles of its railroad lines between Buffalo, New York and Eidenau, Pennsyl-vania to the Buffalo and Pittsburgh Rail-road ("B & P") because decreased traffic on the route had shrunk CSX's profits.

The proposed sale agreement obligated B & P to retain 160 of the 226 CSX employees on the line, but B & P was free to reach new labor agreements with retained employees. Several unions representing CSX workers responded to the proposed sale by serving notices on the railroad pursuant to § 6, hoping to change their "agreements affecting rates of pay, rules or working conditions." After a union or a carrier gives § 6 notice of an intended change in their agreement to the other, that provision, as noted above, commands that "rates of pay, rules or working conditions shall not be altered by the carrier until the controversy has finally been acted upon." The union cannot strike during this period, either. *Detroit & Toledo Shore Line Railroad Co. v. Transportation Union* 396 U.S. 142, 149–150, 90 S.Ct. 294, 299, 24 L.Ed.2d 325 (1969) (*"Shore Line"*.) Hence, what has been called the "status quo" between labor and management is preserved while negotiations over the proposed change take place. This process "provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement." *Id.* at 150, 90 S.Ct. at 299.

By the end of October, 1987, the dispute between CSX and UTU was before the United States District Court for the Western District of New York, after removal from New York State Supreme Court and certain actions by the Interstate Commerce Commission. *See CSX I,* 879 F.2d at 993. CSX sought a declaratory judgment that it need not engage in pre-sale § 6 bargaining with the unions, and an injunction prohibiting strikes to impede the sale. UTU sought an injunction proscribing the sale pending the outcome of § 6 negotiations and maintaining the status quo in the meantime.

On May 26, 1988, the district court ruled. *Decker v. CSX Transportation, Inc.,* 688 F.Supp. 98 (W.D.N.Y.1988), *aff'd sub nom., CSX I,* 879 F.2d 990 (2d Cir.1989). It first considered whether the CSX–UTU dispute was "major" or "minor" under the RLA.[1] Major disputes are controversies over the formation of, or the addition of new terms to, a collective bargaining agreement. They are governed by § 2, Seventh, and § 6 of the RLA. *Elgin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). Minor disputes are disagreements over the meaning of terms already present in existent collective bargaining agreements, and are governed by RLA § 2, Sixth and § 3 First(i) (1982). *Id.* Put another way, "major disputes seek to create contractual rights, minor disputes to enforce" ones that already exist, though they may be in dispute. *Consolidated Rail Corp. v. RLEA,* 491 U.S. 299, 302, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250 (1989). Applying the Supreme Court's rule of *Consolidated Rail* that a carrier need only proffer an "arguable" contractual justification for its proposed action in order to classify the dispute as minor, *id.* at 307, 109 S.Ct. at 2482–83, the court held that CSX had offered a plausible interpretation of their agreement with UTU that would authorize line sales without pre-sale bargaining to protect lost jobs. *Decker,* 688 F.Supp. at 112.[2] The case was therefore sent to the RLA-mandated repository of all minor disputes: binding arbitration before a National Railroad Adjustment Board or a special adjustment board established by the parties. RLA § 3, 45 U.S.C. 153, First and Second (1982). The arbitrators would determine

---

1. Nowhere are these terms found in the RLA itself. Rather they are linguistic creations of the Supreme Court. *See Elgin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. at 1290 (1945); *Consolidated Rail Corp. v. Railway Labor Executives' Association,* 491 U.S. 299, 302–307, 109 S.Ct. 2477 at 2479–83 (1989). For reasons that are explained in the text above, Judge Posner has suggested that minor disputes are better labelled "interpretation disputes," and major disputes called "modification disputes," but he acknowledges that "it may be too late to change the terminology." *Chicago & North Western v. RLEA,* 908 F.2d 144, 148 (7th Cir. 1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991).

2. This decision was based on the court's belief that the agreement's reduction-in-force provisions and past CSX practices might authorize job losses following track sales. *Decker,* 688 F.Supp. at 110–112.

whether CSX's contractual justification is more than just plausible, *i.e.* whether the agreement actually allows the sale and force reduction. On the court's order, the sale was allowed to proceed, but was stayed pending expedited appeal. We lifted that stay after oral argument in *CSX I*, and the sale was completed on July 19, 1988.

UTU appealed the court's decision in *Decker*. While that appeal was pending, the parties established Special Board of Adjustment No. 1018 (the "board") to decide their minor dispute. The board found on December 15, 1988 that, because the agreement between CSX and the unions and past practice were silent on the question, CSX was not *contractually* authorized to sell lines without first bargaining over additional protections for displaced workers. Award dated December 15, 1988 at 18–20. But since the agreement did not forbid CSX's actions either, the board could conclude only that the unions had not contractually waived whatever rights to pre-sale bargaining they might have had under the RLA. Award at 21. The question then became: what *are* those RLA rights? As that statutory issue is beyond arbitral, contractual jurisdiction, the "award" contained no remedy.

On June 7, 1989, we issued *CSX I*, our opinion in UTU's appeal of *Decker*. There we affirmed *Decker's* finding that the CSX–UTU dispute was a minor one, and denied UTU's motion, argued on grounds that the board's decision somehow vitiated the court's preceding decision that the dispute was minor, to vacate *Decker*. We found no "conflict between the district court's conclusion that CSX's position was 'plausible,' and the Board's conclusion that CSX should nonetheless not prevail." *CSX I*, 879 F.2d at 1003.

Following *CSX I*, this dispute—"minor" for RLA purposes but by now enormous in terms of the time and procedural maneuvering expended on it—continued back in district court, where UTU asked for a remand to arbitration instructing the board to fashion a remedy, and CSX sought to vacate the board's decision on grounds that

its jurisdiction was exceeded. The court first held that arbitral jurisdiction had not been transgressed. *CSX Transportation Inc. v. United Transportation Union*, 765 F.Supp. 797, 803–809 (W.D.N.Y.1991) ("*CSX II*"). It then considered the underlying question of law: whether CSX, which had no contractual justification for selling the line without first bargaining, was required to bargain by RLA § 6, the status quo provision. The court decided that a line sale *does* constitute a change in "rates of pay, rules, or working conditions." Thus, it held, once the unions filed their notices to amend the agreement in response to the news that CSX was planning a line sale, CSX was obligated by § 6 to maintain the status quo by forgoing the line sale and its attendant job losses until negotiations over those proposals were complete. *Id.* at 814. The court remanded the matter to the board to consider whether to, and how to "make union members whole, *i.e.*, put them in the position they would have been in had they been entitled to maintain the status quo under § 6." *Id.* at 811. Because we disagree with the conclusion that a line sale represents an alteration of salaries, rules or job conditions for § 6 purposes, we reverse.

### DISCUSSION

#### I. *Jurisdiction*

■ Appellees argue that we lack jurisdiction to hear this appeal, since it comes to us from an order by the district court remanding their dispute with CSX to arbitration to consider what remedy is due workers displaced by the sale. They rightly point out that, because additional issues may unfold during arbitration, remands to the board are usually not deemed final and appealable under 28 U.S.C. § 1291. *See, e.g., Liberian Vertex Transports, Inc. v. Associated Bulk Carriers, Ltd.*, 738 F.2d 85, 87 (2d Cir.1984); *Shearson Loeb Rhoades, Inc. v. Much*, 754 F.2d 773, 795 (7th Cir.1985). We have held, though, that remands to arbitration may be appealed where "all issues properly within the arbitrator's province have been resolved." *Ottley v. Schwartzberg*, 819 F.2d 373, 375

(2d Cir.1987) (district court's denial of petition to confirm arbitration award, and remand of pension dispute to arbitration under the Federal Arbitration Act, held reviewable). Here, as in *Ottley*, no arbitrable issues remain.

The propriety of the remand in this case hinges on the correctness of the district court's view of § 6. If the court had been right in holding that § 6 imposed pre-sale bargaining obligations on CSX that were not complied with and, as the board held in its first decision, were not justified by the agreement or past practice, then the remand would have been the proper means to compensate the workers for · actions allowed neither by statute nor by contract.[3] We would then lack jurisdiction, as additional, remedial issues awaited arbitration. But here, we hold that CSX was under no such § 6 obligation. Since the board has already determined that the agreement's only relevance to the post-sale job loss is its retention of workers' § 6 status·quo rights, and since we decide today that employees hold no such rights in cases of line sales, the board cannot award a remedy. There is no basis for it, contractual or statutory. Hence "the usual justification for appeala-

bility—that nothing remains to be done in the action"—underscores our review here. *Liberian Vertex Transports*, 738 F.2d at 87. *See also Chicago & North Western Transportation Co. v. RLEA*, 908 F.2d 144, 156 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991) ("[I]f there is no dispute over the meaning of a contract, there is nothing for [the arbitrators] to do").

For purposes of review, we cite our decision in *International Produce Inc. v. A/S Rosshavet*, 638 F.2d 548 (2d Cir.), *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981), though that opinion did not discuss jurisdiction explicitly. In *International Produce*, the district court's erroneous construction of the Arbitration Act, 9 U.S.C. § 10 (1976), led it to vacate an arbitration panel's award. We could have delayed our review until the completion of the rearbitration that was, presumably, to follow. Instead, we reached and reversed the underlying statutory error, thus necessarily settling the jurisdictional issue because our decision on the merits left nothing to rearbitrate. There, as here, jurisdiction and substance were closely related. And where appealability is "intertwined with

---

**3.** We reject CSX's contention that the board would be powerless to remedy workers aggrieved by the sale, just as it was dismissed when made by the unions in *CSX I.* There we said that:

> Appellants' remedy for any perceived inadequacy in the Board's determination, however, is provided by RLA § 3 First (q), 45 U.S.C. § 153 First (q) (1982), which establishes a judicial remedy for "any employee or group of employees ... aggrieved by the failure of any [adjustment board] to include certain terms in [its] award." *Id.* The reviewing court "shall have jurisdiction to affirm the order ... or to set it aside, in whole or in part, or it may remand the proceeding ... for such further action as it may direct." *Id.*

*CSX I*, 879 F.2d at 1005. *See also Consolidated Rail*, 491 U.S. at 310 n. 8, 109 S.Ct. at 2484 n. 8; *General Committee of Adjustment, UTU, Western Maryland RR Co. v. CSX Railroad Co.*, 893 F.2d 584, 593–594 n. 11 (3rd Cir.1990); *Chicago & North Western Transport Co. v. RLEA*, 855 F.2d 1277, 1288 (7th Cir.), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 529 (1988). Acceptance of CSX's position would leave displaced workers without remedy whenever a railroad met what Consolidated Rail called the "relatively light burden" of showing an arguable contrac-

tual justification for the disputed action. 491 U.S. at 307, 109 S.Ct. at 2482–83 (quoting *Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern R. Co.*, 802 F.2d 1016, 1022 (8th Cir.1986)). Since minor disputes are within the exclusive jurisdiction of arbitration boards, *id.* 491 U.S. at 304, 109 S.Ct. at 2481; *APFA v. American Airlines, Inc.*, 843 F.2d 209, 211 (5th Cir.1988) (absent a "break down" in Congress' administrative mechanisms, "minor disputes must be routed through" arbitration), the court could hardly order its own remedy. Only the board, therefore, can act. That does not mean, however, that, were we to affirm in this case, the board would be awarding a "statutory remedy." Rather it would be compensating workers for § 6 deviations by the carrier that the *agreement* fails to sanction. The railroad, having pressed for arbitration because it believed the agreement permitted the post-sale layoffs, cannot now complain that the board is remedially impotent when it finds that the agreement does not explicitly allow its actions. Thus our jurisdiction here stems from the lack of anything for the board to properly do, not from a holding that arbitrators are somehow unable to compensate workers for RLA violations that the contract fails to subsequently cure.

one of the central substantive issues," we agree with the First Circuit that "there is sometimes much to be said for candidly deciding the merits rather than toying with them in a jurisdictional minuet." *Locals 2222, 2320–2327, International Brotherhood of Electrical Workers, AFL–CIO v. New England Telephone & Telegraph*, 628 F.2d 644, 646 (1st Cir.1980). We therefore turn to the merits.

## II. *The Board's Findings*

■ CSX first urges us to reverse on grounds that *CSX II* erred in confirming the board's finding. It argues, as it did below, that the board exceeded its mandate. We are unpersuaded, but need not belabor the issue since we reverse on statutory grounds that are elucidated below.

Before discussing the board's decision, we note that our review of it must be extremely limited. The RLA commands that an arbitral decision "shall be conclusive on the parties," unless, *inter alia*, the board fails "to conform, or confine itself, to matters within the scope of [its] jurisdiction." RLA § 3, 45 U.S.C. § 153, First (q) (1982).[4] The Supreme Court has characterized review of arbitral awards as "among the narrowest known to the law." *Union Pacific Railroad Co. v. Sheehan*, 439 U.S. 89, 91, 99 S.Ct. 399, 401, 58 L.Ed.2d 354 (1978). Indeed, "[p]erhaps 'review' is a misnomer;" where fraud is not an issue, we ask only "whether the arbitrators did the job they were told to do—not whether they did it well, or correctly, or reasonably, but simply whether they did it." *Brotherhood of Locomotive Engineers v. Atchison, Topeka and Santa Fe Railway Company*, 768 F.2d 914, 921 (7th Cir.1985); *see also Skidmore v. Consolidated Rail Corp.*, 619 F.2d 157, 159 (2d Cir.1979), *cert. denied*, 449 U.S. 854, 101 S.Ct. 148, 66 L.Ed.2d 488 (1980).

CSX claims that the board here acted beyond its jurisdiction in three ways. First, it argues, the board decided an issue not put before it. CSX submitted the following question to the board:

> Have the Organizations sustained their burden of proof that the Carrier does not have the *unilateral right*, under its existing collective bargaining agreements and past practices, to dispose of its rail lines …?

*CSX II*, 765 F.Supp. at 804 (emphasis in original). The board's version of this question was as follows:

> Did the Carrier have the unilateral right, under existing collective bargaining provisions or past practice, to abolish its positions in connection with the sale of the Buffalo–Eidenau Line without first negotiating with the Organizations as to the affected employees?

*Id.* The court found "no essential difference between" these questions. *Id.* at 805. Nor do we. CSX's inclusion of the word "unilateral" indicates that its submission encompasses the question of whether CSX had obligations to the unions. CSX wished to learn whether it could sell without first bargaining with UTU, and the board answered that the agreement and past practice neither permitted nor prohibited it from doing so. While parties, not the arbitrators, define the issues to be arbitrated, *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648–649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986), the difference here is at most semantic, and insufficient to overcome "the presumption of authority that … [a board's] award is within the submission." *Johnston Boiler Co. v. Local Lodge No. 893*, 753 F.2d 40, 43 (6th Cir.1985).

CSX also argues that the board based its decision not on the agreement but on an extra-jurisdictional analysis of the RLA. But the board was careful to confine itself to the question of whether the agreement waived the unions' "*asserted* statutory right, *if any*, to bargain." Award at 16 (emphasis added). It noted that the issue

---

**4.** We may set aside or remand to further arbitration an award only:

> for failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters

> within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order.

RLA § 3, 45 U.S.C. § 153, First (q) (1982).

of whether those rights exist is a "determination [that] is properly before the courts." *Id.* There is a difference, of course, between interpreting a statute, and interpreting a contract's relationship to that statute. While the former is not allowed, the latter—especially in cases like this where "issues of statutory interpretation and of contractual interpretation ... seem inextricably intertwined," *CSX II,* 765 F.Supp. at 807—does not run afoul of the proscription against basing awards *"solely* upon the arbitrator's view of the requirements of enacted legislation." *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 53, 94 S.Ct. 1011, 1022, 39 L.Ed.2d 147 (1974) (emphasis added) (quoting *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)).

Finally, CSX contends that the board exceeded its jurisdiction by rewriting the parties' contract. It relies on the agreement's failure, in its reduction-in-force provisions, to specify the circumstances under which employees may be laid off.[5] To CSX, this silence connotes the provisions' applicability to firings made for any reason, including line sales. To the board, "nothing in the terms of these provisions ... would in any way allow a conclusion that the parties intended or contemplated that the RIF or furlough provisions would apply to a line sale." Award at 17. Given the deference we attach to arbitrators' contractual conclusions, and in recognition of the fact that the provisions in question are hardly unambiguous, we find no violation of the board's jurisdiction. *See United Food and Commercial Workers Union, Local 1119, AFL–CIO v. United Markets Inc.,* 784 F.2d 1413, 1416 (9th Cir.1986) (arbitration award vacated for rewriting parties' agreement where arbitrators' interpretation in "direct conflict" with agreement's plain meaning); *Miller v. Chicago & North Western Trans-*

*portation Co.,* 647 F.Supp. 1432, 1439–1440 (N.D.Ill.1986) (award that contravened "clear and unambiguous" contractual meaning vacated).

### III. *Line Sales and the Status Quo Requirement of RLA § 6*

■ The central issue raised by CSX on appeal is whether the § 6 requirement of a carrier to maintain the "rates of pay, rules [and] working conditions" of its employees, after the unions file notices to amend the agreement, applies to a line sale. Put simply, when a railroad sells its tracks, is it changing the salaries, rules or conditions of employment for workers on those tracks? The district court answered affirmatively; we disagree and reverse.

Any discussion of § 6's applicability to line sales must begin with the Supreme Court's recent decision in *Pittsburgh & Lake Erie Railroad Co. v. RLEA,* 491 U.S. 490, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989) (*"P & LE"*). That case involved a railroad that sold all of its lines to another carrier without engaging in pre-sale status quo bargaining. Unlike CSX here, P & LE sought to exit the railroad business entirely. The Court found § 6 inapplicable to such an eventuality and was "unconvinced" that "the relationship of employer-employee and the state of being employed are among those working conditions that may not be changed until the RLA procedures are satisfied." *Id.* at 505, 109 S.Ct. at 2593–94. According to the Court,

the decision to close down a business entirely is so much a management prerogative that only an unmistakable expression of congressional intent will suffice to require the employer to postpone a sale of its assets pending the fulfillment of any duty it may have to bargain over the subject matter of union notices such as were served in this case. Absent

---

**5.** As the district court noted, a typical reduction-in-force clause reads:

(a) When it becomes necessary to reduce expenses, the forces at any point or in any department or subdivision thereof shall be reduced, seniority to govern; and employees affected to take the rate of the job to which they are assigned.

(b)(1) Five working days' advance notice will be given to employees affected before the abolishment of positions or reduction in force, and list of employees affected will be furnished to the local committee....

*CSX II,* 765 F.Supp. at 801–802 n. 3.

statutory direction to the contrary, the decision of a railroad employer to go out of business and consequently to reduce to zero the number of available jobs is not a change in the conditions of employment forbidden by the status quo provision of § 156.

*Id.* at 509, 109 S.Ct. at 2595–96. Since *P & LE*, three circuits have had occasion to consider whether the management prerogative that allows a carrier to sell all of its lines without awaiting the resolution of § 6 pre-sale bargaining also allows it to sell some of them. All have held that it does— that a partial line sale is no more a change in the status quo than is a total line sale. *RLEA v. CSX Transportation, Inc.*, 938 F.2d 224, 229 (D.C.Cir.1991); *C & NW v. RLEA*, 908 F.2d at 152; *RLEA v. Chicago & Northwestern Transportation Co.*, 890 F.2d 1024, 1025 (8th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990); *see also RLEA v. Chesapeake Western Railway*, 738 F.Supp. 1544, 1555 (E.D.Va.), *aff'd on other grounds*, 915 F.2d 116 (4th Cir.1990). As far as we know, the holding below is the first to the contrary.

The District Court relied, as it had to, on the distinction between the total line sale at issue in *P & LE*, and the partial sale of track engaged in by CSX.[6] *CSX II* at 812–814. It made much of the Supreme Court's decision in *Order of Railroad Telegraphers v. Chicago & North Western Railway Co.*, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960) (*"Telegraphers"*), where the Court considered the case of a railroad that eliminated some little-used maintenance and telegraph stations, and thus the jobs in those stations, along its tracks. That, the Court held, did constitute

a change in the status quo and thus had to await the outcome of § 6 bargaining. *Id.* at 336–338, 80 S.Ct. at 764–65. Similarly, the unions stress *Shore Line*, which involved a railroad that sought, without bargaining, to reassign workers to outlying jobs away from its central yards. The Court held that because § 6's status quo requirement includes all "actual, objective working conditions," not just those explicitly mentioned in the agreement, the carrier had to preserve the old assignments during bargaining. *Shore Line*, 396 U.S. at 153, 90 S.Ct. at 301. To the court and appellees, these cases together apparently stand for the proposition that anything a railroad does that affects jobs, short of going out of business, alters the status quo.

■ We do not think *Shore Line* and *Telegraphers* extend so far. *P & LE* "plainly limited their application," *RLEA v. CSX Transport.*, 938 F.2d at 229, distinguishing them on grounds that they did not involve a carrier in the process of withdrawing from the business via line sales. *P & LE*, 491 U.S. at 506–507, 508 n. 17, 109 S.Ct. at 2595 n. 17. A more fundamental distinction between those cases and this one is that *Shore Line* and *Telegraphers* involved railroad decisions that were explicitly about job conditions—where best to place workers along a railroad line (*Telegraphers*), and whether to work at central or dispersed locations (*Shore Line*). The decision to sell a track line is fundamentally different. It is not primarily about labor but about capital, or business assets. As Judge Posner of the Seventh Circuit put it,

> The decision to sell a line is not a decision about the utilization of labor or about wages, work rules, working conditions,

---

**6.** The district court also relied on our statement in *CSX I* that, "[h]ad the district court reached this conclusion [that CSX's plausible contractual justification actually had no merit] at the outset, it would presumably have treated the controversy as a major dispute, *and CSX would have been required to maintain the status quo as to the affected employees." CSX II*, 765 F.Supp. at 813 (emphasis in original) (quoting *CSX I*, 879 F.2d at 1003 n. 9). To the district court this statement apparently meant that the failure of CSX's contractual justification before the board, which occurred after the dispute was designated mi-

nor, answered the question of what status quo requirements attach to line sales. But we explicitly refused to "prejudg[e], or provid[e] a rule of decision for, any of the issues that may arise in the currently pending, or any subsequent, litigation concerning [the board's] decision." *CSX I*, 879 F.2d at 1005. All our statement reflects is the unremarkable proposition that, had the dispute been labeled major at the outset, CSX would have had to meet the obligations of § 6. That begs the question that we answer today: what *are* those § 6 requirements when line sales occur?

job rights, etc. It is a decision to reduce the extent of the railroad's business, akin to a manufacturer's decision to curtail its output or to retire unneeded capacity without replacing it. It is not a decision about labor inputs. It has of course consequences for the workers—any major business decision does. But if this were enough to make it a change in pay, work rules or working conditions, then every significant business decision that a carrier made would be a mandatory subject of collective bargaining; there would be no management prerogatives; and *Pittsburgh & Lake Erie,* which holds that the carrier is not required to bargain over the sale of its business, would be incoherent.

*C & NW v. RLEA,* 908 F.2d at 152; *see also RLEA v. CSX Transport.,* 938 F.2d at 229.

We agree that the central message of *P & LE* is that line sales are decisions committed to management prerogative, irrespective of whether the railroad is only partially or gradually leaving the market, as here, or is exiting it fully and immediately. That distinction is the essence of the district court's opinion, but we think it foreshadows an unworkable regime of railroad management and carrier-union relations. Unless we were to hold that even a sale of virtually all lines did not bring *P & LE*'s management prerogative rationale into play—which we shun "since it would be absurd to make a railroad bargain over the sale of 99 percent of its lines but not over the sale of 100 percent," *C & NW v. RLEA,* 908 F.2d at 152—we would have to adopt a sort of middle position where § 6 ceases to apply when "most" or "a substantial amount" of railroad track is sold. Such a result would be infeasible, though, as the parties could never know for sure which line sales rise to the level of management prerogative, and which are too insubstantial. The stability and measured predictability that were intended as the very hallmarks of the RLA would be undercut by this sort of case by case regime, as would the harmonious interaction between the RLA and the Interstate Commerce Act, though that was not argued below. *See*

*id.; RLEA v. CSX Transport.,* 938 F.2d at 230.

In sum, application of § 6 cannot be made to turn on the number or length of lines sold in a given transaction. A line sale is either a matter of management prerogative or it is not. We hold that it is. Section 6 was intended to govern decisions by the railroad that alter labor conditions after a proposal to amend the agreement is filed. The decision to sell a line, however, is one primarily about the use of business assets, and only affects labor conditions indirectly. Therefore, a railroad has no obligation to await the outcome of bargaining over proposals to amend its agreements with labor, as part of its duty to maintain rates of pay, rules and working conditions under § 6, before it completes a line sale.

## CONCLUSION

Because CSX had no duty to delay its sale of the Buffalo–Eidenau Line to B & P, there are no grounds on which the board can remedy workers adversely affected by the sale. The agreement, found by the board to be silent as to job protections after line sales, was not violated. And we hold today that the RLA was complied with as well. Consequently, there is nothing remaining for the board to do.

Accordingly, we reverse the order of the district court, and dismiss the case.