**TRANS WORLD AIRLINES, INC. and William D. Hart and Gary D. Dilley, as members of the Retirement Board of the Retirement Plan for Pilots of Trans World Airlines, Inc., Plaintiffs,**

**v.**

**Anthony V. SINICROPI, H.O. Van Zandt, and W.A. Murphey, as members of the Retirement Board of the Retirement Plan for Pilots of Trans World Airlines, Inc., William L. Meusel, Jr., and the Air Line Pilots International Association, Defendants.**

No. 93 Civ. 3094 (CSH).

United States District Court,
S.D. New York.

May 30, 1995.

■■■■■■■■■■■■■■■

Marla S.K. Gale, Jones, Day, Reavis & Pogue, New York City, for Trans World Airlines Inc., William D. Hart, Gary D. Dilley, as members of the Retirement Bd. of Retirement Plan For Pilots of Trans World Airlines, Inc.

Jani R. Rachelson, Cohen, Weiss and Simon, New York City, for Van Zandt, W.A. Murphey, as members of the Retirement Plan For Pilots of Trans World Airlines, Inc., William L. Meusel, Jr., Air Line Pilots Ass'n Intern.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This case centers around the applicable standard in determining the propriety of a pension benefit eligibility determination made by an arbitration board established pursuant to a collective bargaining agreement between Trans World Airlines ("TWA") and the Air Line Pilots International Association ("ALPA"). The arbitration board made an award in favor of defendant William Meusel, and plaintiffs now seek to vacate and set aside that award. ALPA and Meusel have counterclaimed to have the arbitration board's award confirmed.

### Statement of Facts

Meusel was employed for twenty-four years as a pilot for plaintiff and counterclaim defendant TWA. He left the company on August 1, 1990, when he was fifty-four years of age.

At that time, Meusel was fully vested in the Pilots Plan, a defined benefit pension plan covered by ERISA, 29 U.S.C. § 1001 et seq. (the "Plan"). The Plan pays a fixed retirement annuity to eligible participants (called "Members") computed on the basis of the Member's years of service and earnings at TWA. The Plan was established in 1950 by agreement between TWA and defendant and counterclaim plaintiff ALPA, the collective bargaining representative of TWA's pilots.

Under the Plan, accrued benefits are calculated with reference to a specified normal retirement age. Normal retirement age under the Plan is "the Member's sixtieth birthday." Ex. 1, at 13. Eligible Plan Members, however, may retire prior to age 60, and begin drawing their accrued benefit any time after age 45. When a Member elects early retirement, the amount of his or her monthly benefit is reduced by a specified amount for each month that the early retirement date precedes the normal retirement date. The value of the Member's accrued benefit, however, remains the same in such a situation, since the reduced monthly payments are expected to be made over a longer period of years.

There is one exception to this rule, and the underlying dispute centers around the proper scope of this exception. Under Section 4.4 of the Plan, a Member who retires after reaching age 55 or accumulating 30 years of service may draw his accrued retirement benefit in *unreduced* monthly payments.[1] Specifically, in the language of the Plan, a Member's monthly payments will not be reduced "upon his retirement ... if the Member has attained age 55 or if the Member has completed 30 years of Continuous Service as a Pilot or Flight Engineer with the Company ...".

In the summer of 1990, Meusel left TWA to take a job with a different airline. He was 54-⅓ years old at the time. Prior to leaving, however, Meusel asked TWA whether he would qualify for the Disputed Benefit if he left the company before age 55, but postponed receipt of his benefit until after his 55th birthday. TWA responded in the negative. In a letter dated June 18, 1990, TWA informed Meusel that "[a]nytime you retire prior to age 55 you[r benefit] will be reduced

---

[1] Plaintiffs contend that the exception provides eligible members with an early retirement "subsidy", because it requires the plan to pay out more than the actuarial equivalent of the participant's accrued benefit. Defendants contend that the exception entitles those who qualify to a benefit that is "unreduced", as compared to those who retire before age 55. While I tend to think plaintiffs' characterization is the more accurate, I will refer to the alleged entitlement as the "Disputed Benefit."

4% for each year from age 60." The letter concluded:

"... [S]ince you will be leaving before age 55 the reduction will apply if you commence your annuity before age 60. If you were to continue working with TWA until age 55 th[e]n you would receive an unreduced benefit from the "A" Plan [i.e., the Pilots Plan]. There has been extensive research done on this subject and if there should be any changes we would notify you but for now this is the interpretation of the plan." Hart, Ex. 3.

Before leaving TWA, Meusel sent TWA a letter in which he stated that his "retirement date is August 1, 1990". He also requested, however, that the Plan defer payment of his retirement annuity until April 1, 1991, a date just after his 55th birthday.

On August 8, 1990 ALPA and Meusel filed an appeal under the claims review procedure set forth in the Plan document, seeking a determination that Meusel's deferral of the receipt of his retirement benefits until he had reached age 55 entitled him to the Disputed Benefit. That procedure establishes a Retirement Board (the "Board") "to settle all disputes under the Plan and to aid the Company in the administration of the Plan." ALPA and TWA each choose two members to serve on the Board. Each Board member has one vote, and any Board decision requires the affirmative vote of three members to render a decision. If the initial four Board members deadlock, a fifth voting member is selected to serve as an impartial referee and Chairman of the Board.

The Plan gives the Board "full power to affirm, reverse or otherwise modify any decision or administrative action or proposed action which gave rise to any dispute." In addition, the Plan specifies that the Board's decision on review is "final and binding upon" TWA, ALPA, and others who deal with the Plan. The only apparent limitation on the Board's review is that it shall have "no power to add to or subtract from or modify any of the terms of the Plan."

ALPA and Meusel asked the Board to decide whether Meusel would be entitled to the Disputed Benefit by terminating service with TWA at age 54, but deferring receipt of his first monthly payment until after age 55. The four-member Board deadlocked, with plaintiffs and counterclaim defendants William Hart and Gary Dilley, the TWA appointees, voting against Meusel, and defendants H.O. Van Zandt and W.A. Murphey, the ALPA appointees, voting for Meusel.

As a result of the deadlock, pursuant to the Plan, a fifth Board member, defendant Anthony Sinicropi, was appointed to serve as impartial referee. On October 24, 1991, Sinicropi convened a hearing to consider Meusel's appeal. Both parties presented testimony and argument concerning their reading of the Plan, and two actuaries testified regarding the impact of each party's reading on the funding of the Plan. Finally, during and after the hearing, TWA presented testimony and documents with regard to the manner in which it had administered this particular provision of the Plan in the past.

### The Board's Opinion

Following the completion of the hearing, Sinicropi drafted a ten-page opinion finding that Meusel was entitled to the Disputed Benefit because he had not retired within the meaning of the Plan until age 55, when he received his first payment under the Plan. Sinicropi then circulated the opinion to the other members of the Board. Hart and Dilley voted to deny Meusel the Disputed Benefit and refused to join Sinicropi's opinion. Van Zandt and Murphey, however, concurred in the decision, and thus, Sinicropi's opinion became the final board opinion (hereinafter, the "Board's Opinion" or the "Board's Decision").

Plaintiffs [2] contend that the Board's Opinion is clearly wrong. First, they argue that Sinicropi improperly framed the issue as "[w]hether William Meusel is entitled to an unreduced benefit under the Retirement Plan for Pilots." In plaintiffs' view, Sinicropi perceived the general rule for actuarially reducing an early retiree's monthly payment as

2. For simplicity's sake, I will use "plaintiffs" to refer to the plaintiffs on the original complaint, and "defendants" to refer to the defendants on

the original complaint, without regard to the parties' status on the counterclaim.

a "penalty", when in fact, the exception to the rule is a subsidy, rather than the norm. Thus, Sinicropi improperly perceived the issue as whether or not Meusel should be penalized, rather than whether or not he should receive an extra benefit.

Plaintiffs next contend that Sinicropi failed to give adequate deference to TWA's interpretation of the Plan. Section 2.1(A) specifies in relevant part that TWA, as Benefits Administrator, "shall make determinations ... as to any question involving interpretation or application of the Plan...." Plaintiffs argue that despite this language, the majority made explicit their belief that TWA's view was entitled to no deference. They also argue that despite noting that the evidence of past practice favored TWA's analysis, the Board's Opinion expressly departs from that practice.

Finally, plaintiffs contend that the Board's Opinion blatantly misconstrues the terms of the Plan by removing the concept of termination from the meaning of "retirement." According to plaintiffs, the Plan clearly states that an employee who elects to retire after the age of 55 is entitled to the Disputed Benefit. The Board's Opinion, however, defines retirement to be the date upon which retirement benefits commence, rather than the date upon which the employee leaves the company. Thus, simply by waiting to receive benefits until the age of 55, every employee will be eligible for the Disputed Benefit.[3] In plaintiffs' view, this interpretation is plainly contradicted by the terms of the Plan, nonsensical as a matter of pension policy, and

detrimental to the stability of the Plan by rendering it severely underfunded.[4]

In their complaint, plaintiffs argue that the Board's Opinion violates ERISA as well as the Railway Labor Act, 45 U.S.C. § 151 et seq. ("RLA"). Plaintiffs ask the Court to vacate the Board's Opinion, declare that it is not binding precedent, and enjoin the defendants from failing to comply with the Plan and ERISA.

With the exception of Sinicropi, all parties have now moved for summary judgment. For the reasons set forth below, the motion for summary judgment of defendants ALPA, Meusel, Van Zandt and Murphey is granted.[5] Plaintiffs' motion for summary judgment is denied.

### The Standard for Summary Judgment

Under Fed.R.Civ.P. 56(c), the moving party is entitled to summary judgment if the papers "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." On such a motion, "a court's responsibility is to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2d Cir.1991) (citing *Knight v. U.S. Fire Insurance,* 804 F.2d 9 (2d Cir. 1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)) (citation omitted). The responding party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The non-movant cannot 'escape summary judg-

---

**3.** Plaintiffs contend that according to the estimates of their actuaries, if every employee selected the option chosen by Meusel, under the Board's Decision, the Plan would require up to $40 million in additional funding to meet its obligations. Defendants contend that since pilots who defer receipt of their benefits until a later date lose their benefits during the deferral period, the number of pilots for whom the Meusel option would be desirable is quite small. Thus, in their view, the unfunded liability of the Plan as a result of the Board's Decision will not be nearly as great as that suggested by plaintiffs. In addition, defendants contend that even if the unfunded amount is large, that is the fault of TWA for not making sufficient contributions, rather than the fault of the Board.

**4.** This is only a general summary of plaintiffs' objections to the Board's Opinion. I will consider those objections in greater detail, with reference to the language of the Plan, in the analysis below.

**5.** Sinicropi had earlier moved to dismiss the complaint against him on the ground that his status as an arbitrator rendered him immune from suit. This Court denied the motion in a Memorandum Opinion and Order dated April 11, 1994. Sinicropi has filed a motion for reconsideration of that opinion, and that motion is presently pending before the Court. In light of the present Opinion, however, it is apparent that Sinicropi is also entitled to summary judgment.

ment merely by vaguely asserting the existence of some unspecified disputed material facts,' ... or defeat the motion through 'mere speculation or conjecture.'" *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (citations omitted). While the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## Discussion

While the underlying facts of this case are not in dispute, the parties vigorously dispute the applicable law. In plaintiffs' view, this case is primarily about ERISA and whether or not defendants' actions as fiduciaries of the Plan violated the terms of the Plan, and of ERISA. In the alternative, plaintiffs' argue that the Board's Decision can also be set aside as being in violation of the RLA. In defendants' view, this case is about the extreme deference to be given decisions made by labor arbitration boards under the RLA. According to defendants, plaintiffs' ERISA claims are pre-empted by the RLA, and under the RLA, the Board's Decision survives scrutiny. Thus, as a threshold matter, I must decide the proper interaction of ERISA and the RLA.[6]

■ The RLA, which governs labor relations in the airline industry, compels binding arbitration of certain labor-management disputes.[7] 45 U.S.C. § 181 et seq.; *Baylis v. Marriott Corporation,* 843 F.2d 658, 661 (2d Cir.1988). In particular, the RLA requires carriers and unions to establish system boards of adjustment to resolve all "disputes ... growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working

conditions." 45 U.S.C. § 184; *See Also Andrews v. Louisville & Nashville Railroad Co.,* 406 U.S. 320, 323–24, 92 S.Ct. 1562, 1564–65, 32 L.Ed.2d 95 (1972); *Brotherhood of Locomotive Engineers v. Louisville & Nashville Railroad Co.,* 373 U.S. 33, 38, 83 S.Ct. 1059, 1062, 10 L.Ed.2d 172 (1963); *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.,* 353 U.S. 30, 39, 77 S.Ct. 635, 639, 1 L.Ed.2d 622 (1957). An employee pension plan is an agreement falling within the scope of the RLA, and a Retirement Board established pursuant to a pension plan that is part of a collective bargaining agreement is a "system board of adjustment" under the RLA. *E.g., Long v. Flying Tiger Line, Inc. Fixed Pension Plan for Pilots,* 994 F.2d 692, 694 (9th Cir.1993) ("*Flying Tigers*"); *Loveless v. Eastern Air Lines, Inc.,* 681 F.2d 1272, 1274 & n. 2, 1275 (11th Cir.1982); *De la Rosa Sanchez v. Eastern Airlines, Inc.,* 574 F.2d 29, 31 (1st Cir.1978).

I will say more about the standard of review of system board of adjustment decisions under the RLA later, but it is sufficient for the present purposes to note that a court's role in reviewing such decisions is extremely limited. *See, e.g., CSX Transportation, Inc. v. United Transportation Union,* 950 F.2d 872, 877 (2d Cir.1991) ("*CSX*") (judicial review under the RLA may be a "misnomer"); *Skidmore v. Consolidated Rail Corp.,* 619 F.2d 157, 159 (2d Cir.1979), *cert. denied,* 449 U.S. 854, 101 S.Ct. 148, 66 L.Ed.2d 488 (1980) ("*Skidmore*") (review under the RLA is " 'among the narrowest known to the law' "). Review of pension benefit decisions under ERISA, in a non-RLA case, is less deferential. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989) (denial of benefits challenged under § 502(a)(1)(B) of ERISA to be reviewed de novo, unless plan administrator or fiduciary has discretion to construe the terms of the plan, in which case decision is to be reviewed under "arbitrary and capricious

---

6. The pension plan in this case constitutes part of a broader collective bargaining agreement between ALPA and TWA. I will use the terms "Plan" and "Collective Bargaining Agreement" interchangeably when referring to the pension plan that is the subject of the present litigation.

7. The RLA was enacted in 1926, and was intended to provide a comprehensive framework for the resolution of labor disputes between railroads and their employees. The Act was made applicable to disputes between airline carriers and employees in 1936.

standard"); *Pagan v. Nynex Pension Plan and Nynex Corporation,* 52 F.3d 438, 441–42 (2d Cir.1995).

Plaintiffs contend that it is unnecessary to decide which standard of review applies because, in their view, the Board's Decision can be set aside under either standard. The Court disagrees. As will be explained below, I am convinced that the Board's Decision must stand if reviewed under the standard of review applied to decisions under the RLA. It is less clear that the decision should survive under the standard of review applied to decisions under ERISA. It is thus critical to determine the standard of review to be applied.

Although the ultimate goal is to determine the proper standard of review, the analysis involves a question of jurisdiction. Plaintiffs maintain that this Court is confronted with the task of reviewing the propriety of the Board's Decision under two separate bodies of law, ERISA and the RLA. Defendants maintain that the RLA pre-empts ERISA in this particular case, so that the Court lacks subject matter jurisdiction to decide plaintiffs' rights under ERISA. Thus, in their view, only one standard of review should be employed, and that standard should be the one used to review system board determinations under the RLA.

### A. Is ERISA pre-empted by the RLA?

■ The RLA requires mandatory arbitration for two categories of disputes. The first category, concerning "rates of pay, rules or working conditions," 45 U.S.C. § 151a, are deemed "major" disputes. Such disputes relate to " 'the formation of collective bargaining agreements or efforts to secure them.' " *Consolidated Rail Corp. v. Railway Labor Executives' Assn.,* 491 U.S. 299, 302, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250 (1989), quoting *Elgin, J. & E.R. Co. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945).

■ The second category of disputes are "minor" disputes. These are disputes "growing out of grievances or out of the interpretation or application of agreements covering rate of pay, rules, or working conditions", 45 U.S.C. § 151a, and they "involve controver-sies over the meaning of an existing collective bargaining agreement in a particular fact situation." *Trainmen v. Chicago R & I.R. Co.,* 353 U.S. 30, 33, 77 S.Ct. 635, 637, 1 L.Ed.2d 622 (1957). If a dispute is a "minor" one, its resolution is governed exclusively by the arbitration scheme contained in the RLA, and a party may not avoid the effect of that scheme by characterizing the claim as arising under some alternative body of law. *Hawaiian Airlines v. Norris,* —— U.S. ——, ——, 114 S.Ct. 2239, 2242, 2244, 129 L.Ed.2d 203 (1994) (*"Hawaiian Airlines"*); *Atchison, T. & S.F.R. Co. v. Buell,* 480 U.S. 557, 563, 107 S.Ct. 1410, 1414, 94 L.Ed.2d 563 (1987) (*"Buell"*). It is thus necessary to determine if the present dispute is a "minor" one within the meaning of the RLA.

■ The Supreme Court has recently held that the determination of whether a dispute is a "minor" one, and accordingly whether its resolution by an RLA system board pre-empts an alternative cause of action, is to be made using the same analysis employed in determining whether a cause of action is pre-empted by Section 301, 29 U.S.C. § 185, of the Labor Management Relations Act ("Section 301"). *Hawaiian Airlines,* —— U.S. at ——, 114 S.Ct. at 2249. Section 301 allows a party to a collective bargaining agreement to bring an action in federal court to remedy a violation of that agreement. The Supreme Court has held that Congress, in passing Section 301, sought to insure that uniform federal law be applied to the interpretation of collective bargaining agreements. *See, e.g., Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 404, 108 S.Ct. 1877, 1880, 100 L.Ed.2d 410 (1987). Therefore, when a claim depends upon an interpretation of the collective bargaining agreement, Section 301 is the exclusive remedy available. *Id.* at 405–06, 108 S.Ct. at 1881. When, however, the claim is independent of the collective bargaining agreement, it is not pre-empted. *United Steelworkers of America v. Rawson,* 495 U.S. 362, 367–69, 110 S.Ct. 1904, 1909, 109 L.Ed.2d 362 (1990); *Allis–Chalmers v. Lueck,* 471 U.S. 202, 211–12, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985). It is thus necessary to determine whether any or all of plaintiffs' claims are independent of the collective bargaining agreement.

While the standard "independent of the collective bargaining agreement" appears simple on its face, application of the standard to particular fact patterns has not proven easy. Indeed, a number of commentators have noted that pre-emption law is not, as a general rule, a model of clarity. *See, e.g.,* Richard Shell, *ERISA and Other Federal Employment Statutes: When is Commercial Arbitration an "Adequate Substitute" For the Courts?,* 68 Tex.L.Rev. 509 (1990). Nonetheless, a review of the facts and holdings of several important cases provides a workable framework for analyzing whether the present claims are pre-empted.

In the *Hawaiian Airlines* case, the Supreme Court held that the RLA did not pre-empt an employee's state-law wrongful discharge claim. —— U.S. at ——, 114 S.Ct. at 2251. It reasoned that the issue of whether the employer's actions made out a claim of discharge under Hawaii law was a "purely factual question", determinable without any reference to the collective bargaining agreement. *Id.* The fact that a determination of whether the employer's conduct also violated the collective bargaining agreement would also require a similar factual analysis did not pre-empt the state law cause of action. *Id.*

In *Lingle,* the leading case on Section 301 pre-emption, an employee was fired for filing an allegedly false worker's compensation claim. 486 U.S. at 401, 108 S.Ct. at 1879. The applicable collective bargaining agreement protected employees against discharge except for "proper" or "just" cause. *Id.* The employee brought a state law wrongful discharge action in state court, and the employer removed based on diversity. *Id.* at 402, 108 S.Ct. at 1879. Both the District Court and the Court of Appeals held that such an action was pre-empted because the same factual analysis would be required to analyze both claims. *Id.* The Supreme Court reversed. *Id.* at 401, 108 S.Ct. at 1879. It noted that "where the resolution of a state-law claim depends on an interpretation of the collective-bargaining agreement, the claim is pre-empted". *Id.* at 405–06, 108 S.Ct. at 1881. However, when the dispute centers around "purely factual questions"

about an employee's conduct or an employer's conduct and motives, no interpretation of the collective bargaining agreement is required. *Id.* at 407, 108 S.Ct. at 1882. Thus, given that such "factual questions" were at the heart of plaintiff's claim, the state law wrongful discharge claim was not pre-empted by the LMRA. *Id.*

The Court went on to note that the result was not altered by the fact that the state law claim might depend in part on an analysis of the collective bargaining agreement. Rather, the Court stressed that "as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for Section 301 pre-emption purposes." *Id.* at 408–10, 108 S.Ct. at 1882–83.

Lastly, in *Buell, supra,* a railroad employee sought damages for workplace injuries under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq., which provides a remedy to railroad workers injured through an employer's or coworker's negligence. 480 U.S. at 559, 107 S.Ct. at 1412. The railroad argued that the conduct in question was subject to the collective bargaining agreement, and therefore the employee's sole remedy was through RLA arbitration. *Id.* at 560, 107 S.Ct. at 1412. The Supreme Court disagreed:

"[N]otwithstanding the strong policies encouraging arbitration, 'different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers.' The FELA ... provides railroad workers with substantive protection against negligent conduct that is independent of the employer's obligations under its collective-bargaining agreement." *Id.* at 565, 107 S.Ct. at 1415.

■ As the preceding discussion reflects, those cases that have held that an alternative cause of action is not pre-empted have typically involved alternative laws that provided employees with substantive, minimum levels of protection.[8] *See also* Michael Campbell,

8. As the cited cases make clear, pre-emption may be required when the party seeking to avoid pre-

*Grievance Procedures: The Carrier's Perspective,* C941 ALI–ABA 293, 307 (1994); *Barrentine v. Arkansas–Best Freight Sys.,* 450 U.S. 728, 734, 101 S.Ct. 1437, 1441, 67 L.Ed.2d 641 (1981) (wage claims under the FLSA not pre-empted); *Coppinger v. Metro–N. Commuter R.R.,* 861 F.2d 33 (2d Cir.1988) (§ 1983 action, based on Fourth Amendment violation, not pre-empted). In all these cases, the employee would have been able to bring an action under the alternative source of law even if he or she had never been a party to a collective bargaining agreement.

 It is apparent from reading these cases that it is critical to understand what is meant by a "claim or right" that is independent of the collective bargaining agreement. State laws that provide a right of action to recover for a breach of contract, and provisions of ERISA that allow a party to bring an action for failure to adhere to the terms of a pension plan, are certainly independent of a collective bargaining agreement. In addition, these laws do, in a practical sense, provide entities with "rights" that are valuable and substantive, in that they provide access to the court system and a body of rules for insuring that parties adhere to their voluntary agreements. They are not the type of "rights", however, that were meant to escape RLA and LMRA pre-emption. "Rights" such as these provide a mechanism to vindicate some other substantive right. Congress, however, in the RLA and in Section 301, has provided a mechanism for vindicating these "other substantive rights" when they are generated solely from the terms of a collective bargaining agreement. In such cases, Congress' interest in having such disputes resolved through its specified mechanism pre-empts alternative mechanisms that otherwise would have entitled the aggrieved party to seek the same relief.

 The independent "rights" at the heart of pre-emption analysis can best be discerned by looking at the ultimate or specific relief sought by the aggrieved party.

The general relief sought is that the other side not breach the collective bargaining agreement; the ultimate or specific relief sought is that, i.e., the employer award the employee the $5 raise provided for in the collective bargaining agreement. If this specific right is generated from a source outside of the collective bargaining agreement, a party may employ an alternative available mechanism to vindicate it. If, however, the specific right owes its existence solely to the terms of the collective bargaining agreement, the RLA arbitration mechanism must be the exclusive vehicle for vindication of that right.

A hypothetical may be useful in illustrating the difference between a claim that is pre-empted and one that is not. A collective bargaining agreement might provide that certain employees working in "managerial" positions are entitled to a wage of $18/hour. The right to be paid that wage does not exist in any source of law, and came into existence solely through the terms of the collective bargaining agreement. The employee would have no right to it if the collective bargaining agreement did not exist. Thus, an action by an employee seeking a determination that she is a "managerial" employee entitled to that wage rate would be governed exclusively by the RLA arbitration scheme, and would pre-empt a breach of contract action based on state law.

Conversely, if that same collective bargaining agreement provided that "non-managerial" employees would earn a wage of $2/hour, an employee disgruntled with an interpretation of the collective bargaining agreement placing him in this category, though pre-empted from bringing a state law breach of contract action, would not be pre-empted from bringing an action under the Federal law establishing a minimum hourly wage. This is because the employee's right to a wage above that provided for by the collective bargaining agreement exists independently of whatever obligations may be specified in the agreement.

*See Hawaiian Airlines,* —— U.S. at —— n. 6, 114 S.Ct. at 2247 n. 6. Therefore, cases involving pre-emption of state laws are equally relevant to the present dispute.

---

emption has asserted a claim based on state law. While this case involves an alternative claim based on a federal statute, the federal/state distinction appears to be of no significance to a proper analysis of when pre-emption is required.

Turning now to the present case, plaintiffs' complaint contains six counts of alleged violations of the ERISA statute. They can be summarized as follows:

(1) Defendants, as fiduciaries, failed to discharge their duties "in accordance with the documents and instruments governing the plan", as required by Section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). This failure is evidenced by various misinterpretations of the contract's provisions. Count 1.

(2) Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) requires plan fiduciaries to discharge their duties in compliance with a standard of prudence. By requiring the plaintiffs to provide Meusel with a benefit that is not "in accordance with the documents and instruments governing the plan", plaintiffs will be forced to breach their fiduciary duty to act with prudence in discharging their duties. Count 2.

(3) By determining that Meusel was eligible for the Disputed Benefit, defendants demonstrated a lack of understanding or ignorance of the concept of actuarial equivalence, such that they did not discharge their duties with the prudence required by Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). Count 3.

(4) By determining that Meusel was eligible for a benefit not provided for by the Plan, the defendants placed the Plan in a position of being underfunded, jeopardizing its compliance with the funding requirements of the Internal Revenue Code and ERISA. By placing the Plan in such a predicament, defendants breached their fiduciary duty under Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). Count 4.

(5) If plaintiffs are required to follow the Retirement Board Opinion as precedent, they will be required in the future to provide a benefit that is not "in accordance with the documents and instruments governing the plan", such that they will be in breach of their fiduciary duty under Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). Count 5.

(6) Section 410(a), 29 U.S.C. § 1110(a) forbids any provision in an agreement or instrument which purports to relieve an ERISA fiduciary of his fiduciary responsibility. By relying on Sinicropi's contention that the Board was not bound by any fiduciary responsibility, the Board violated this provision of ERISA, as well as public policy. Count 8.

None of these counts presents a claim independent of the collective bargaining agreement. What plaintiffs ultimately seek is to deny Meusel and others in his situation the Disputed Benefit. Their right to do so, if it exists, is generated solely by the terms of the Collective Bargaining Agreement between TWA and ALPA. While ERISA may also provide a mechanism for plaintiffs to vindicate their rights, pre-emption requires that the RLA arbitration scheme be the exclusive vehicle for the pursuit of that goal.

It is arguably true that the alleged failure to consider ERISA's commands, that fiduciaries act in accordance with plan documents and that they discharge their duties with prudence, deprived plaintiffs of significant "rights" by depriving them of a Board interpretation guided by certain maxims and a specified level of care.[9] Those "rights", however, are, as discussed above, in

---

**9.** I use the word "arguably" because wholly apart from the issue of pre-emption, ERISA's "fit" with plaintiffs' claims is a rough one at best. The fiduciary duties relied upon by plaintiffs are, by ERISA's terms, to be exercised solely for the benefit of Plan beneficiaries and participants, of which plaintiffs are neither. It is thus not clear, assuming for the sake of argument that all the Board Members, including Sinicropi, are ERISA fiduciaries, that plaintiffs are owed a fiduciary duty.

The Plan itself is no doubt owed a fiduciary duty, and plaintiffs may have standing to raise claims on behalf of the Plan. However, even assuming plaintiffs' real interest here is the integrity of the Plan rather than their own liability for contributions, the Court is unable to locate any authority suggesting that an interpretation of a pension plan legitimately rendered pursuant to a collectively bargained-for arbitration procedure is a breach of a fiduciary duty to the pension plan. Rather, the language of Section 409(a), the provision of ERISA imposing liability upon fiduciaries, as well as cases under the provision, suggests that it was intended not as a tool to police the proper construction of the collective bargaining agreement, but rather to prevent fiduciaries from depriving beneficiaries of what they concededly had been promised. *See Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 142–44, 105 S.Ct. 3085, 3090–91, 87 L.Ed.2d 96

the nature of general rights, constituting a part of ERISA's mechanism for challenging an interpretation of a collective bargaining agreement. They are of no independent value to plaintiffs absent the existence of a right to deny Meusel and others in his situation the Disputed Benefit.[10] That ultimate right is generated solely by the Collective Bargaining Agreement, and thus may be vindicated, if at all, only through the RLA arbitration scheme.

Plaintiffs also argue that the Board's interpretation of the Plan has placed the Plan in violation of ERISA by rendering it underfunded, and thus in jeopardy of losing its approved status under the Internal Revenue Code and ERISA. If the Board's interpretation had rendered the Plan in violation of ERISA, plaintiffs would be entitled to challenge it, since the right would flow from ERISA rather than the Plan itself. In the present case, however, plaintiffs have cited no provision of ERISA that forbids a term in a pension plan that provides the benefit at issue to an individual in Meusel's situation.[11] If the Plan will be rendered underfunded as

(1985). Thus, cases have found breaches of fiduciary duties in instances where the fiduciary has invested plan assets carelessly, *Dasler v. E.F. Hutton & Co., Inc.*, 694 F.Supp. 624, 632 (D.Minn.1988); *Katsaros v. Cody*, 568 F.Supp. 360, 369 (E.D.N.Y.1983); engaged in self-dealing, *Martin v. National Bank of Alaska*, 828 F.Supp. 1427, 1436 (D.Alaska 1992); distributed plan assets without concern for the collective bargaining agreement, *Botto v. Friedberg*, 568 F.Supp. 1253, 1257 (E.D.N.Y.1982); refused, in bad faith, to comply with the terms of the collective bargaining agreement, *Ironworkers Local No. 272 v. Bowen*, 695 F.2d 531, 535 (11th Cir.1983); or failed to disclose information as required by ERISA, *Larsen v. NMU Pension Plan Trust of NMU Pension & Welfare Plan*, 767 F.Supp. 554, 557 (S.D.N.Y.1991). While I am not prepared to say that ERISA's fiduciary obligations have no conceivable applicability here, I seriously doubt that these fiduciary provisions were intended as a tool to enable employers to obtain an independent reexamination of the merits of an arbitrator's good faith interpretation of a collective bargaining agreement. *See, e.g.*, G. Richard Shell, *ERISA and Other Federal Employment Statutes: When is Commercial Arbitration an "Adequate Substitute" For the Courts?*, 68 Tex.L.Rev. 509, 545–46 (1990) (noting that while ERISA creates federal court jurisdiction over benefit disputes, "it does not create any new theories of liability supporting such claims.")

Indeed, while Section 502(b)(1)(B) provides a plan participant or beneficiary with the right to bring a civil action to recover benefits under a plan, or to enforce his rights under the terms of a plan, ERISA does not provide a similar right of action for employers to enforce their rights under the terms of a plan. The right of action in Section 502(b)(1)(B) suggests that Congress intended this provision to be the vehicle for challenging an interpretation of a pension plan, rather than an action for breach of a fiduciary duty. That Congress did not give employers a similar right to bring an action to enforce their own rights under the terms of a plan suggests that ERISA is not particularly concerned about an interpretation of a pension plan requiring employers to make *greater* contributions than the employer had thought required. While other areas of the law are obviously concerned that employers receive the benefit of their bargained for contracts, ERISA's only *raison d'etre* is to insure that a particular class of entities, pension beneficiaries and participants, receive the expected fruits of their bargains.

10. In *Long v. Flying Tiger Line, Inc. Fixed Pension Plan for Pilots*, 994 F.2d 692, 694 (9th Cir.1993), employees who had been denied benefits by a retirement board's interpretation of the scope of a pension plan brought a suit in federal court under ERISA. The employees argued that the summary description of the plan provided greater benefits than the plan itself, and that a number of cases had held that in such situations, the summary description should govern. *Id.* at 694–95. The Ninth Circuit, however, held that the ERISA claim was pre-empted by the RLA arbitration scheme:

"These cases suggest that the Retirement Board had reason to defer to the express language of the summary plan description in the event of a contradiction between the summary and the plan itself. Nonetheless, the issue before this court is whether the district court had subject matter jurisdiction over appellants' claim for relief. Without such jurisdiction, the district court cannot consider the correctness of the Retirement Board's decision or the relevance of the [cited] line of cases."

The same principle is applicable here. While the Board might have had reason to approach its task with prudence, ERISA's requirements are only applicable if the Court properly has jurisdiction under ERISA. Because the ERISA claims are not independent of the collective bargaining agreement, I do not have jurisdiction under ERISA. Its various provisions can thus not be used as grounds for relief.

11. Plaintiffs also claim that the Board's interpretation allows an employee to collect retirement benefits while still employed, potentially endangering the Plan's tax-qualified status under a provision of the Internal Revenue Code forbidding such a practice. In this case, however, the Board's ruling was limited to holding that an

a result of the Board's Decision, the deficiency is not the fault of the Board, but of TWA for not making the payments required by the Plan as legitimately interpreted.

Finally, plaintiffs argue generally that Congress passed ERISA to protect pension beneficiaries, and that pre-emption will have the effect of evading ERISA's "comprehensive and reticulated" regulatory scheme for enforcing such protections. These policy arguments have largely been subsumed in and resolved by the Supreme Court's jurisprudence on when pre-emption is required, but I will address them nonetheless.

■ ERISA was passed in response to widespread abuses in the management of pension plans that had the effect of injuring employees who relied on the expected availability of their pensions. Section 2, 29 U.S.C. § 1001; *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720, 104 S.Ct. 2709, 2713, 81 L.Ed.2d 601 (1984). ERISA requires that pension plans be run honestly and prudently, and provides a cause of action in federal court to facilitate the enforcement of these requirements. While ERISA requires that benefits be clearly set out in a Plan, and that the Plan be managed honestly and prudently, it embodies no policy or concern with regard to the magnitude of benefits that may or must be offered by any Plan.[12] Rather, ERISA is concerned only that whatever terms are ultimately agreed to by the parties be enforced, and that the benefits embodied in those terms not be squandered by those with responsibility for administering the Plan.

■ Pre-emption in this case is thus fully consistent with Congressional intent with regard to both ERISA and the RLA. The RLA embodies a policy concern that "minor" disputes be resolved exclusively through the medium of arbitration, rather than the less efficient medium of the courts. While an arbitrator is typically bound by fewer constraints in reaching a decision than the law would impose upon a judge, the RLA embodies a policy preference for an efficient and final determination of such matters rather than a judicial determination and its attendant protections. However, federal laws that provide employees with substantive, minimum levels of protection reflect the importance attached to these rights by Congress and thus, an RLA arbitrator's decision that abrogates such protections is properly not insulated from review.[13] In the language

employee who first left the company, and then deferred receipt of retirement benefits, was entitled to the Disputed Benefit. There is nothing in the Board's Decision endorsing the broader holding that an employee can elect to receive retirement benefits while still employed.

12. ERISA does contain vesting, participation, and benefit accrual requirements which are in some cases calibrated to benefit and salary levels. These provisions, under certain circumstances, would make it improper to deny an employee certain benefits, even though the particular benefit level had no intrinsic importance. Plaintiffs, however, have not pointed to any provision of ERISA that forbids a pension plan in general, or this particular plan, from providing an individual in Meusel's situation with the Disputed Benefit.

13. In non-RLA cases, the Supreme Court has frequently held that agreements to arbitrate a particular dispute bar relitigation of that dispute in Court, even if the dispute involves an important substantive right embodied in a federal law. *See, e.g., Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991). Those cases are based on the strong national policy in favor of arbitration embodied in the Federal Arbitration Act, and turn on an analysis of whether Congress intended to forbid employees from voluntarily waiving their right to a judicial forum. *Id.* at 26, 111 S.Ct. at 1652.

Contracts of airline employees, however, are exempted from the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1; *Bates v. Long Island Railroad*, 997 F.2d 1028, 1034, *cert. denied*, ——— U.S. ———, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993), and arbitration pursuant to the RLA is mandatory rather than voluntary. Thus, unlike in non-RLA cases, the Supreme Court has not analyzed the problem from the perspective of whether the railway employee voluntarily waived the right to a judicial forum, and whether Congress intended to preclude such a waiver with regard to the statute at issue. *See, e.g., Hirras v. National Railroad Passenger Corp.*, 10 F.3d 1142 (5th Cir. 1994), *vacated*, ——— U.S. ———, 114 S.Ct. 2732, 129 L.Ed.2d 855 (1994) (Fifth Circuit holding, that railway employee's agreement to be bound by the collective bargaining agreement and its arbitration provision was the equivalent of a voluntary waiver of a judicial forum, remanded for consideration in light of *Hawaiian Airlines* ). Rather, pre-emption under the RLA occurs not because the parties agreed to waive a judicial forum, and because the FAA encourages the enforcement of

of pre-emption, these are protections, or rights, that are independent of a collective bargaining agreement.

When, however, the right being sued upon exists solely as a result of the parties' agreement, there is no reason to think that Congress has invested the agreed-to terms with such special importance that their proper vindication must be assured by a determination in the courts.[14] In the language of pre-emption, these are "minor" disputes. In these cases, where Congress has not recognized the right at issue as intrinsically worthy of protection, the efficiency and finality concerns behind the RLA's exclusive arbitration scheme prevail over concerns that parties seeking to vindicate the right receive the added protections attached to a judicial determination.

Notwithstanding plaintiffs' attempts to characterize the Board's Decision as detrimental to the Plan itself, rather than simply

creating an additional liability for TWA, the only issue in this case is whether or not TWA and ALPA agreed that an individual in Meusel's situation is entitled to the Disputed Benefit. TWA believes it never agreed to pay such a benefit in such a situation; ALPA believes it did. The answer to that dispute lies solely in the terms and meaning of the Plan itself, and ERISA has absolutely nothing to say on the matter. Congress has expressed no opinion on the desired outcome of a dispute such as this, and thus no policy concern flowing from ERISA can override the clear policy of the RLA that "minor" disputes by resolved exclusively through mandatory arbitration. Since I have determined that plaintiffs' claims present a "minor" dispute, an ERISA claim cannot be maintained.[15]

■ I have thus determined that plaintiffs' ERISA claims are pre-empted by the RLA.[16] That is not the end of the pre-

such waivers, but because Congress expressed a clear intent to pre-empt alternative causes of action when the dispute is a "minor" one. No such intent, however, can be inferred when the dispute in question is not "minor", i.e., when it exists independently of the collective bargaining agreement.

14. Indeed, in the *Firestone* case, the Supreme Court held in the context of a non-RLA case that the decisions of pension administrators empowered with discretion to make benefit eligibility determinations are to be reviewed under a deferential "arbitrary and capricious" standard of review. 489 U.S. at 115, 109 S.Ct. at 956. While that standard of review is not as deferential as that applied to RLA system boards, the case nonetheless contravenes plaintiffs' suggestion that Congress believed benefit eligibility determinations to be so important that any review other than *de novo* review by a federal district judge would be insufficient.

15. The Court emphasizes that its analysis concerns the pre-emptive effect of the RLA only on the specific ERISA claims raised in this case. There are undoubtedly other provisions of ERISA that do create rights independent of a collective bargaining agreement, as well as alternative claims under the provisions asserted here that might, depending on the underlying facts, avoid pre-emption.

16. The Court notes that prior to *Hawaiian Airlines*, every Court that considered the issue of whether the RLA arbitration scheme pre-empts review of benefit determinations under ERISA reached the same result. *See, e.g., Bowe v.*

*Northwest Airlines, Inc.*, 974 F.2d 101, 103 (8th Cir.1992) (citations omitted), *cert. denied*, —— U.S. ——, 113 S.Ct. 1602, 123 L.Ed.2d 164 (1993); *Beard v. Carrollton R.R.*, 893 F.2d 117, 123 (6th Cir.1989); *Air Line Pilots Ass'n, International v. Northwest Airlines, Inc.*, 627 F.2d 272, 275–76 (D.C.Cir.1980); *Bonin v. American Airlines, Inc.*, 621 F.2d 635, 638–39 (5th Cir.1980); *De la Rosa Sanchez*, 574 F.2d at 33; *Eisenberg v. Trans World Airlines, Inc.*, 654 F.Supp. 125, 128 (S.D.Fla.1987), *aff'd without opinion*, 875 F.2d 872 (11th Cir.1989). While these cases were decided prior to *Hawaiian Airlines*, when the Section 301 pre-emption analysis was first held to apply to RLA pre-emption, they are nonetheless persuasive. Though the pre-*Hawaiian Airlines* analysis of RLA pre-emption did not explicitly involve the same test as that employed in the analysis under Section 301, the *Hawaiian Airlines* court decided to unify the two analyses largely because courts analyzing RLA pre-emption had frequently employed the same standard and considered the same factors. *See Hawaiian Airlines*, —— U.S. at ——, 114 S.Ct. at 2249 (tracing the "convergence" of the pre-emption standards applied under each statute). Thus, far from overruling these prior RLA cases, the Court simply recognized that the analysis that had been employed in the past was not largely different in substance than the one which would apply in the future.

Plaintiffs rely on a pre-*Hawaiian Airlines* case from the Second Circuit in which the Court held that the RLA did not pre-empt a suit under the Federal Rehabilitation Act, even though the asserted wrong was also covered by a collective bargaining agreement. *Bates v. Long Island R.*

emption analysis, however, for plaintiffs make an additional argument that must be addressed. Plaintiffs argue that even if pre-emption applies, it requires only that plaintiffs first utilize the RLA arbitration scheme before bringing a federal action in court under ERISA. In their view, once arbitration has been utilized, as it was in this case, the Court may properly exercise jurisdiction over the non-RLA claims.

The Court disagrees. The RLA states that system board awards "shall be final and binding", and the Supreme Court has construed this language to pre-empt non-RLA remedies even if the dispute has first been determined by an Adjustment Board. *Brotherhood of Locomotive Engineers v. Louisville and Nashville Railroad Company*, 373 U.S. at 37–39, 83 S.Ct. at 1062; *Union Pacific Railroad Co. v. Price*, 360 U.S. 601, 608–09, 79 S.Ct. 1351, 1355, 3 L.Ed.2d 1460 (1959) (In enacting the RLA, Congress intended to bar an "employee's subsequent resort to the common-law remedy after an adverse determination of his grievance by the Adjustment Board."); *Brady v. Penn Central Transportation Company*, 406 F.Supp. 1239, 1242 (S.D.N.Y.1975) ("Courts have taken the position that one may not make use of the adjudicatory machinery of the Railway Labor Act and upon a disappointing result, seek redress in the courts."); Gary Green, et al., *Grievance Resolution and the System Board of Adjustment: The Labor Organization's Perspective*, C941 ALI–ABA 271, 280 (1994); *Flying Tigers*, 994 F.2d at 695.

This result is compelled not only by the "final and binding" language of the RLA, but by the statute's purpose. The RLA arbitration scheme was put in place by Congress to insure that disputes in the industries to which it applied be resolved in a "prompt and orderly" manner, 45 U.S.C. § 151a, and without the delays and contentiousness inherent in continuous forays into the court system.

*See Buell*, 480 U.S. at 562 n. 9, 107 S.Ct. at 1414 n. 9.

("In enacting the RLA: 'Congress endeavored to promote stability in labor-management relations in this important national industry by providing effective and efficient remedies for the resolution of railroad-employee disputes arising out of the interpretation of collective-bargaining agreements.... The Adjustment Board was created as a tribunal consisting of workers and management to secure the prompt, orderly and final settlement of grievances that arise daily between employees and carriers regarding rates of pay, rules, and working conditions.... Congress considered it essential to keep these so-called 'minor' disputes within the Adjustment Board and out of the courts.'" (citations omitted))

The exclusivity of this scheme furthers that goal. *Flying Tigers*, 994 F.2d at 694–95. By allowing an alternative action to go forward in district court even though an arbitration has occurred, the very issue decided in arbitration will be relitigated, and the intended exclusivity of the RLA arbitration scheme will be lost. *Id.* Plaintiffs have offered no authority to suggest that such a result was intended by Congress.

■ Thus, the Court finds that plaintiffs' claims under ERISA are pre-empted by the RLA. Therefore, I will review the Board's Decision solely under the standard of review applied to system board determinations under the RLA.

**B. Does the Board's Decision Survive Review Under the RLA?**

■ Review of a system board decision under the RLA is extremely narrow, *Union Pacific R. Co. v. Sheehan*, 439 U.S. 89, 93, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978). *CSX, supra*, 950 F.2d at 877; *Skid-*

---

Co., 997 F.2d 1028 (2d Cir.1993). In *Bates*, the Second Circuit did not look to see if the Rehabilitation Act claim was independent of the collective bargaining agreement, but rather, attempted to harmonize the two statutes, ultimately finding that Congress intended to give claims involving civil rights greater protection than that available through arbitration. *Id.* at 1034–35. The result

in *Bates*, however, is entirely proper under *Hawaiian Airlines*, since the Rehabilitation Act provided employees with a substantive right that would have existed even in the absence of a collective bargaining agreement. Plaintiffs here, however, have asserted no substantive right not generated solely from the collective bargaining agreement.

*more,* 619 F.2d at 159, *supra,* and decisions of RLA system boards are "final and binding upon both parties to the dispute." 45 U.S.C. § 153 First (m); *Gunther v. San Diego & Arizona E. Ry.,* 382 U.S. 257, 263–64, 86 S.Ct. 368, 371–72, 15 L.Ed.2d 308 (1965). Such decisions may be set aside only if the Court finds the decision deficient in one or more of the following ways:

1. The Board failed to comply with the requirements of the Railway Labor Act.

2. The Board's decision failed to conform or confine itself to matters within the scope of the [Board's] jurisdiction.

3. The decision was the product of fraud or corruption.

45 U.S.C. § 153, First (p); *Sheehan,* 439 U.S. at 93, 99 S.Ct. at 402.

The cases have recognized that the merits of system board decisions are entitled to insulation from judicial scrutiny, and that to the extent the courts intrude into the merits, "they detract both from the central role of the arbitrator and the palliative effect of the arbitration process." *Loveless,* 681 F.2d at 1275; *See also International Ass'n of Machinists v. Texas Steel Co.,* 538 F.2d 1116, 1119 (5th Cir.1976), *cert. denied,* 429 U.S. 1095, 97 S.Ct. 1110, 51 L.Ed.2d 542 (1977) (courts must "scrupulously avoid the invasion of the arbitration panel's sphere and the enticement of ruling on the 'intrinsic merits' of the dispute.")

■■■■■ Thus, a decision may not be set aside because the court disagrees with the result or rationale, *Diamond v. Terminal Railway Alabama State Docks,* 421 F.2d 228, 233 (5th Cir.1970); because the reasoning was vague or ambiguous, *Eastern Air Lines, Inc. v. Transport Workers Union,* 580 F.2d 169, 173 (5th Cir.1978); because the decision was "arbitrary and capricious," *Singer v. Flying Tiger Line, Inc.,* 652 F.2d 1349, 1356 (9th Cir.1981); or because the decision was "not supported by substantial evidence," *Anderson v. National Railroad Passenger Corp.,* 754 F.2d 202, 203 (7th Cir.1984). The Seventh Circuit has described the standard of review in the starkest terms:

"[The issue] is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract. . . . [O]nce the court is satisfied that they were interpreting the contract, judicial review is at an end, provided there is no fraud or corruption and the arbitrators haven't ordered anyone to do an illegal act." *Hill v. Norfolk & Western Railway Co.,* 814 F.2d 1192, 1195 (7th Cir.1987).

Thus, the Court must review the Board's Decision free from any consideration of its own view of the correct interpretation of the Plan.

Plaintiffs raise three objections to the Board's Decision which they believe warrant reversal:

1) The Board, in its Opinion, omitted key language from the Plan which clearly supported TWA's position. In doing so, the Board exceeded its jurisdiction under the Collective Bargaining Agreement, which states that the Board shall have no power to "add to or subtract from or modify any of the terms of the Plan." Count 6.

2) The Board may not render a decision that is contrary to law. By ignoring ERISA's requirements that fiduciaries discharge their duties with prudence, and in accordance with Plan documents, the Board rendered a decision in violation of ERISA. Count 7.

3) Board members are fiduciaries under ERISA. By rendering a decision in a context in which the members had waived their fiduciary responsibility, the Board violated public policy. Count 8.

I will address the second and third of these objections first. As I have already held, plaintiffs' ERISA claims are pre-empted in this case by the RLA arbitration scheme. Nonetheless, with these two objections, plaintiffs seek to revive ERISA and impose its requirements on the Board, arguing that the failure to follow ERISA rendered the Board's decision unlawful.

■■■■ The Court disagrees. It is true that the Board may not render an unlawful decision, but as I held earlier, plaintiffs have

failed to cite any provision of ERISA that forbids the inclusion in a pension plan of a term that gives individuals in Meusel's situation the Disputed Benefit. There is thus nothing unlawful about the Board's ultimate finding.[17] As to the suggestion that the decision is unlawful because the Board failed to consider ERISA's canons in rendering its decision, that claim is pre-empted by the RLA. These canons are a part of ERISA's mechanism for resolving benefit eligibility disputes, and in the present case, it is only the RLA mechanism that is before the Court. As the Court discussed earlier, the factors that would be considered in reviewing a decision under ERISA are simply not to be considered here.

Plaintiffs' first objection presents a more complicated question, and requires an examination of the Plan's language and the Board's Decision. Section 4.4 of the Plan is the key provision. It reads as follows, with the words omitted by the Board set forth in bold, bracketed type:

"A Member may elect [,] by written notice within the ninety day period ending on the benefit commencement date to have his **[Retirement Income begin upon his]** retirement at an earlier optional retirement date, but in no event before the first day of the month following his forty-fifth birthday. In the event of retirement at an earlier optional retirement date, the Member's Retirement Income otherwise payable under Sections 6.2 and 6.3 or Section 6.4 will be reduced by ⅙ of 1% for each full month by which the Member's earlier optional retirement date precedes his normal retirement date; provided, however, that ... (B) there shall be no reduction if the Member has attained age 55 or if the Member has completed 30 years of Continuous Service as a Pilot or as a Flight Engineer with the Company."

TWA argued before the Board that language throughout the Plan, including the be-

ginning of Section 4.4, meant that an employee wishing to qualify for the Disputed Benefit under Section 4.4(B) had to be employed with the company at the time he reached 55. The Board's Decision, however, interpreted 4.4(B) to mean that a pilot is eligible for the Disputed Benefit if he defers receipt of his retirement benefits until he has reached age 55, even if he has left the company prior to that point.

In the majority's view, the Plan distinguished between a "terminated member" and a "retired member", such that it was reasonable to think that while an employee no longer with the company was "terminated", he was not "retired" until he had begun to receive his retirement benefits. In addition, in the majority's view, the plain language of Section 4.4(B) supported this view. The majority reasoned that had TWA wished "with the Company" to modify the requirement in the first clause that the applicant attain age 55, it should have included "with the Company" in the first clause instead of only following the "years of continuous service" provision. In addition, the majority felt that "the words 'if [the] member' in the second clause of [Section 4.4(B)] confirms ALPA's interpretation of the Plan" because those words would be "superfluous if 'in the Company' modified the first exception in Section 4.4(B)." Thus, the Board concluded:

"When a member of the Company (or this Board for that matter) reads this provision and concludes that he is eligible for a Meusel-type situation, the Company has either engaged in poor drafting or, in fact, believes that a member needs only to attain the age of 55 before he receives an unreduced benefit."

Plaintiffs argue that this interpretation not only contradicts the clear language of the Plan, but that it makes no sense as a matter of pension policy. In particular, they emphasize that by omitting the bracketed language from Section 4.4, the majority determined

---

**17.** As support for their argument that the Board's award was unlawful, plaintiffs cite a number of cases in which courts have held that an employee is only entitled to an unreduced early retirement subsidy if he is still employed with the company at the time the subsidy accrues. The holdings of those cases, however, were not based on legal conclusions compelled by ERISA, but on the terms of the particular agreement before the Court. At most, these cases suggest that the Board's Decision was ill-reasoned. That does not mean, however, that the Board's Decision was unlawful under the RLA.

that an employee may elect the date on which he would like to be considered "retired", when the clause clearly entitles the employee only to elect when he would like to receive benefits. Such an interpretation, according to plaintiffs, renders the clause circular, causing it to read that the receipt of retirement income shall begin upon the date when the employee begins receiving retirement income.[18] In plaintiffs' view, by relying on this omission, the majority added to, subtracted from, or modified the terms of the Plan, in violation of the Collective Bargaining Agreement, and thus exceeded its jurisdiction.

I agree with plaintiffs that the Board's Decision is questionable. While its reading of clause (B) in Section 4.4 is defensible if that language is viewed in a vacuum, the majority's decision essentially ignores numerous other clauses in the Plan, and fails to grapple meaningfully with the obvious question of why TWA would agree to offer an increased benefit to former employees who reach 55 when the employee's attainment of that age has no value to TWA if the employee no longer works there. In addition, while the Board's Decision relies upon the distinction between "terminated member" and "retired member", two phrases explicitly defined at the beginning of the Plan, those phrases do not appear anywhere in Section 4.4., which refers only to "Members," a different, separately defined term. The close reading that was applied to Section 4.4(B) appears to have not found its way to the other sections of the Plan.

I cannot conclude, however, that the majority added to, subtracted from, or modified the terms of the Plan within the meaning of the Collective Bargaining Agreement. Plain-tiffs suggest that the omission of key words from the citation of Section 4.4 is, by definition, "subtracting from" the terms of the Plan, but such physical deletion in a written opinion can hardly be the intended meaning of "subtracting from." The majority did not hold that these words are to be deleted from the Plan, and the language of the Plan remains the same as it did before the Board rendered its decision.[19] This omission in the Board's decision no more "subtracted from" the terms of the Plan than did the Board's failure to cite the full text of numerous other provisions which had nothing to do with the case before it.

Rather, the "add to, subtract from, modify" language was obviously intended to prevent the Board from configuring the obligations between the parties without giving *effect* to the terms of the agreement. Since the Board's jurisdiction extends only to matters within the agreement, it follows logically that the agreement itself forms the boundaries of the Board's authority. *See, e.g., Leed Architectural Products v. Local 6674,* 916 F.2d 63, 65 (2d Cir.1990) ("An arbitrator's authority to settle disputes under a collective bargaining agreement is contractual in nature, and is limited to the powers that the agreement confers." (citation omitted)).

It is, of course, a fine line between explicitly finding that a particular term need not be followed, and simply interpreting that term out of existence by relying on alternative language. The effect in both cases is to treat the language as if it had never been there, and it is of no importance to the aggrieved party whether the arbitrator deprived the party of the benefit of its bargain through a gross mistake, rather than

---

18. Plaintiffs also claim that the award violates section 8.3 of the Plan, entitled "Retirement Income Options After Termination of Service", which reads:

"... A Member whose service has terminated but who retains rights to a Retirement Income may, within the ninety-day period ending on the benefit commencement date, elect in writing to receive a reduced income, beginning on the first of any month after age 45 ... The Retirement Income described in this Section shall be adjusted in accordance with Section 4.4 and **in no event shall the value of such**

**early Retirement Income exceed the value of the Member's vested benefits at the time of such early retirement.**" (emphasis added).

Plaintiffs argue that the Board's award violated Section 8.3 by providing Meusel with retirement income that exceeded the value of his vested benefits at the time of such early retirement.

19. Indeed, defendants argue that the omission was inadvertent, and they point out that the Board's Decision includes this language later when it cites the analogous provision in the summary plan description.

an *ultra vires* act. Nonetheless, a Court reviewing an arbitration board's decision is not concerned that any particular result be reached, but rather that the result be the product of the board's good faith exercise of its responsibilities. That is what the parties have bargained for. *See, e.g., Brotherhood of Locomotive Engineers v. Atchison, Topeka and Santa Fe Railway Company,* 768 F.2d 914, 921 (7th Cir.1985) (the court asks only "whether the arbitrators did the job they were told to do—not whether they did it well, or correctly, or reasonably, but simply whether they did it.") Thus, a "bad" interpretation of a contract must stand if the board genuinely reached its result by engaging in the act of interpretation, while a "good" interpretation of a contract must be reversed if it was the product of fraud.

This insulation of the merits of a board's decision from judicial scrutiny is essential to effectuating the purposes of RLA arbitration. Any time parties to an agreement disagree about the meaning of a term, the party that does not prevail will always be able to claim that the decision had improperly altered the terms of the agreement, such that the decision-maker exceeded its jurisdiction. The result of such a broad reading of the "add to, subtract from, modify" language would be to open up every Board determination to judicial review on the merits, a result that is inconsistent with the RLA, and which could not have been intended by the parties to the Collective Bargaining Agreement. *See, e.g., Skidmore,* 619 F.2d at 159 (rejecting appellant's claim that an adjustment board lacked "jurisdiction to make mistakes"; such an "expansive notion of what is to count as a jurisdictional defect" would improperly give the district court "ongoing authority to remedy all of these errors.")

▮ Thus, the "add to, subtract from, modify" language must be read to require reversal only when a board's decision does not flow from the essence of the contract. *See United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987) ("[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is con-

vinced he committed serious error does not suffice to overturn his decision"). In the present case, had the majority concluded that the Plan did not provide for the Disputed Benefit, but that equitable concerns warranted awarding it nonetheless, the Board would have clearly added to the Plan a term that the Parties did not put there. Here, however, no matter how ill-reasoned the decision, the majority clearly based its decision on an interpretation of the Plan language. That certain language worthy of consideration was overlooked, or not reconciled with the relied-upon language, does not alter the fact that the majority's decision flowed from the essence of the Plan itself.

The cases cited by plaintiffs are to no avail. Plaintiffs cite *Leed, supra,* a case in which the Second Circuit reversed a system board decision on the ground that the board had exceeded its contractual authority by rendering a decision that "added to, subtracted from, or modified" the terms of the collective bargaining agreement. 916 F.2d at 63. In doing so, the Court held that RLA arbitrators are not given the "equivalent of a grant of limitless power", and that their authority

"is contractual in nature, and is limited to the powers that agreement confers. He may not shield an 'outlandish disposition of a grievance' from judicial review 'simply by making the right noises—noises of contract interpretation.'" *Id.* at 65.

While this broad language might suggest that a decision may be reversed on the merits if it is "outlandish", the facts of *Leed* indicate that the Court did not intend such a broad reading. In *Leed,* the employer had promised a new employee a wage rate higher than that of other similarly situated employees. *Id.* at 64. Other employees brought suit challenging the disparate wage rate, and the arbitrator found that the employer had violated the collective bargaining agreement by agreeing to the higher rate. *Id.* However, instead of ordering that the new employee's wage be reduced, the arbitrator ordered that the wage rate of other similarly situated employees be raised, since it would be unfair to allow the company to make the promise to the new employee and then escape its obligation. *Id.* at 65. Thus, while the arbitra-

tor's decision might have been outlandish, it also, as the arbitrator readily admitted, flowed from principles of equity, rather than the terms of the agreement itself. No similar reliance on concerns beyond the terms of the Plan itself is present in this case.

Similarly, in *Georgia–Pacific Corp. v. Local 27*, 864 F.2d 940 (1st Cir.1988), the arbitrator found that an employee had engaged in dishonesty within the meaning of a provision of the collective bargaining agreement that entitled the employer to dismiss for such "dishonesty." *Id.* at 942–3. The arbitrator nonetheless concluded that he had some type of "normal authority" to mitigate the severity of a dismissal based on the employee's overall employment record, and thus, ordered the employee reinstated. *Id.* at 943–4. The First Circuit found that the arbitrator had exceeded his authority under the collective bargaining agreement, since there was "no basis for such 'normal authority' in the source of the arbitrator's power, the collective bargaining agreement." *Id.* at 945. Thus, *Georgia–Pacific*, like *Leed*, is a case where the arbitrator expressly acknowledged that his decision derived from a source of power not contained in the collective bargaining agreement.

 Thus, absent a clear and determinable reliance on a source of authority not contained in the collective bargaining agreement, an arbitrator does not "add to, subtract from, or modify" the terms of a collective bargaining agreement and thereby exceed his jurisdictional authority. The Board in this case clearly engaged in the act of interpretation, and arrived at its decision based on that interpretation, and nothing else. The decision, therefore, cannot be disturbed.

There is one last argument made by plaintiffs, which, while not contained in the complaint, is set out in the motion papers. Plaintiffs argue that TWA's decision as the Plan administrator was entitled to deference by the Board, and that the Board exceeded its authority under the Collective Bargaining Agreement when it engaged in *de novo* review of TWA's determination. Plaintiffs base this argument on Section 2.1(A) of the Plan, which specifies that TWA, as Benefits Administrator, "shall make determinations ... as to any question involving interpretation or application of the Plan, . . . ." Plaintiffs further argue that under *Firestone, supra*, if a plan grants discretionary authority to the administrator to determine eligibility for benefits or to construe the terms of the plan, a court reviewing that decision is to employ a deferential "arbitrary and capricious" standard. 489 U.S. at 115, 109 S.Ct. at 956; *See also Masella v. Blue Cross & Blue Shield, Inc.*, 936 F.2d 98, 102 (2d Cir. 1991). Thus, in plaintiffs' view, since TWA had discretion to interpret the Plan, its decision should have been reviewed by the Board under an arbitrary and capricious standard.

The Court disagrees. As an initial matter, it is not at all clear that *Firestone*, which dealt with the standard to be applied by a *court* reviewing a pension decision, has any applicability here at all. I have no doubt that notwithstanding *Firestone*, the parties to the collective bargaining agreement could properly agree that even though the administrator had discretion to interpret the Plan, the arbitration board would also have similar discretion. Plaintiffs have cited no authority to suggest that the law requires an arbitration board to defer to an administrator's interpretation, even if the agreement enumerating the board's powers states otherwise.

Indeed, that is precisely what the majority of the Board concluded in reviewing TWA's decision *de novo*. The majority concluded that had the parties intended the Board to defer to the administrator, they would have said so in the Plan. Instead, while TWA has the authority to make determinations under the Plan, nothing is said about the conclusiveness of those determinations. In contrast, Section 2.3(E) of the Plan states that all decisions of the Board "shall be final and binding upon the Company, the Association and any other person having an interest in, under or derived from the Plan." In addition, the Board has the power under Section 2.3 "to settle all disputes" under the Plan. Finally, and most significantly, Section 2.3(I) states:

"The Board shall determine all disputes which may arise out of the application, interpretation or administration of the

Plan or concerning participation in or benefits under the Plan, and such jurisdiction shall be exclusive. **The Board shall have full power to affirm, reverse or otherwise modify any decision or administrative action or proposed action which gave rise to any dispute.**" (emphasis added).

I thus agree with the majority that the administrator's decision was due no deference. The argument that the Board was to defer to TWA's interpretation is completely inconsistent with the Board's "full power" to reverse that decision. In addition, it is difficult to see why the parties would have established the elaborate arbitration scheme contained in the Collective Bargaining Agreement had they intended the Board to simply defer to TWA's initial determination. Indeed, given the importance of the initial fact-finding and holding when review is to be deferential, it is implausible to think that ALPA would have devoted so much attention to insuring fair representation on the Board, and the right to select a neutral arbitrator in the event of a deadlock, if it thought TWA's initial non-neutral determinations would be entitled to substantial deference.[20]

I thus conclude that the Board acted within its contractual authority when it made its determination without deferring to the decision of TWA. Therefore, the Board did not exceed its jurisdiction under the RLA, and its decision cannot be disturbed for that reason.

It is thus apparent that there are no material disputes of fact precluding summary judgment, and that as a matter of law, the Board's Decision may not be disturbed. Therefore, defendants' motion for summary judgment is granted. Plaintiffs' motion for summary judgment is denied.

Although defendant Sinicropi, represented by separate counsel, did not move for sum-

mary judgment, he is entitled to it and the complaint will be dismissed against him as well. Sinicropi's motion for reconsideration of the Court's prior ruling respecting his susceptibility to suit is denied as moot.

### Attorney's Fees

Defendants have asked that they be awarded attorney's fees and costs. They base their request on ERISA Section 502, 29 U.S.C. § 1132(g)(1), which grants the court discretion to award attorney's fees and costs in an action "under this subchapter." They claim that attorney's fees are to be liberally provided for so as to protect the statutory purpose of vindicating retirement rights, and to effectuate the remedial purposes of ERISA.

While those principles have been recognized in the case law, this Opinion makes clear that this action does not arise under ERISA. Defendants prevailed because of the RLA, and the rights provided by ERISA had no bearing on this case. As Judge Friendly held in *Fase v. Seafarers Welfare and Pension Plan*, 589 F.2d 112 (2d Cir. 1978), "[a]n altogether sufficient support for the court's decision not to award attorney's fees under ERISA is that the attorney obtained no relief under that statute." Therefore, defendants' application for attorney's fees and costs is denied.[21]

\* \* \* \* \* \*

Plaintiffs' motion for summary judgment is denied. Defendants' cross-motion for summary judgment is granted. The Clerk of the Court is directed to dismiss the complaint as to all defendants with prejudice.

SO ORDERED.

---

**20.** I also note that the Plan empowers the Board to set down rules for the holding of hearings, and to review a variety of documents such as books, records, annual reports, and Trust Fund accountings. (2.3(K), (L)). Consistent with these powers, the hearing in this case involved witness testimony, cross examination, and the introduction of exhibits. Such fact-finding activities are generally at odds with the functioning of a deferential tribunal.

**21.** Defendants do not cite the bad-faith exception for the award of attorney's fees as a separate and alternative basis for an award in the case at bar. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764–67, 100 S.Ct. 2455, 2463–64, 65 L.Ed.2d 488 (1980). But I would not be prepared to hold that TWA acted in subjective bad faith in attempting, albeit unsuccessfully, to seek judicial review under ERISA of this particular arbitration award.